# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 48359

| | | |
|---|---|---|
| LITSTER FROST INJURY LAWYERS, PLLC, an Idaho professional limited liability company, | ) ) ) ) | |
| Third Party Plaintiff-Respondent-Cross Appellant, | ) ) ) ) ) | |
| v. | ) ) | |
| IDAHO INJURY LAW GROUP, PLLC, an Idaho professional limited liability company; MELISSA G. GRYDER, individually, | ) ) ) ) ) | Boise, December 2021 Term |
| Third Party Defendants-Appellants-Cross Respondents. | ) ) ) | Opinion Filed: September 2, 2022 |
| | ) ) | Melanie Gagnepain, Clerk |
| MELISSA G. GRYDER, individually, | ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| JAMES L. WOOD, individually; RYDER TRUCK RENTAL, INC., a Florida corporation, | ) ) ) ) ) | |
| Defendants. | ) ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Jason D. Scott, District Judge.

The judgment of the district court is <u>vacated</u>, its decision granting partial summary judgment is <u>affirmed</u>, and its decisions after the bench trial are <u>reversed</u>. This case is <u>remanded</u> for further proceedings.

Idaho Injury Law Group, PLLC, Boise, for Appellants/Cross-Respondents. Seth Diviney argued.

McFarland Ritter, PLLC, Meridian, for Respondent/Cross-Appellant. Ryan McFarland argued.

_____

BRODY, Justice.

This appeal involves a dispute over the division of a personal injury settlement between a predecessor law firm, a successor law firm, and a client who was subjected to unfair and deceptive trade practices. Litster Frost Injury Lawyers ("Litster") represented Melissa Gryder for approximately three years before Idaho Injury Law Group ("IILG") took over representation and settled Gryder's case roughly two months later for $120,000. Gryder had followed her attorney, Seth Diviney, from Litster to his newly formed firm, IILG. After the personal injury claim was settled, Litster sued IILG and Gryder, claiming a portion of the settlement for attorney's fees and costs it incurred. Gryder, through Diviney as her attorney, counterclaimed that Litster violated the Idaho Consumer Protection Act ("ICPA") and could not recover against the settlement fund. The district court ruled on a motion for partial summary judgment that Litster committed an unfair and deceptive trade practice in violation of the ICPA. However, by the time of the bench trial, the district court understood, based on representations by Diviney, that *only* Litster and IILG had a stake in the disputed portion of the fund—not Gryder. From this, the district court divided the disputed portion of the fund between Litster and IILG. For the reasons discussed below, we reverse the district court's decision after the bench trial and remand this case for further proceedings so the district court may balance the equities between Litster, IILG, *and Gryder*. We also direct the district court to determine, after a hearing on remand, the appropriate sanction for Diviney engaging in an impermissible concurrent conflict of interest since the start of this dispute.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

In August 2016, Gryder was injured in a car wreck and contacted Litster about representing her. Two days after the wreck, Quentin Brown, a Litster intake specialist, went to Gryder's home to intake interview her.

During that interview, Brown summarized the written contingency fee agreement (the "Agreement"). Gryder did not read the Agreement. Instead, she relied on Brown's summary of each section in the Agreement.

Sections 1 and 2 of the Agreement provide the scope of Litster's representation. Those sections also explain how Litster's attorney fees would be calculated and explained that costs are deducted after the fees are taken out of a settlement:

[1] Scope of Employment: . . . . If no settlement or judgment is obtained Client will owe Attorney no fee. If a settlement or judgment is obtained, Client will pay Attorney fees and costs as follows:

[2] Attorney's Fees: Attorney's fees shall be calculated as follows from the gross settlement or judgment amount before any deductions for costs and expenses outlined below:

$33^{1/3}$% if settled prior to filing a Complaint
40% if settled after the filing of a Complaint/Arbitration or Mediation
45% if settled, or if judgment obtained, after the commencement of trial

Section 6 of the Agreement addresses what would occur if Gryder terminated Litster's services before a settlement or judgment was obtained by Litster:

[6] Termination by Client: Client retains the right to terminate the services of Attorney at Client's discretion. Should Client exercise this right, Attorney retains a lien on any recovery obtained by Client, whether by settlement, judgment or otherwise, equal to the reasonable value of Attorney's services which are based on *quantum meruit* or the agreed percentage of any offer obtained by Attorney prior to termination. Attorney shall also retain a lien for any costs advanced at Attorney's discretion.

While summarizing Section 6, Brown incorrectly told Gryder that Litster "would not charge [her] anything" if she fired Litster before it obtained a settlement offer in her case. Gryder alleged that this representation induced her into signing the Agreement. According to Brown, there was no mention of an attorney charging lien on any recovery based on "quantum meruit" or as otherwise agreed.

After the intake meeting, the first attorney Litster assigned to Gryder was Warren Dowdle. Litster also assigned Gryder a "case manager." For the next seven months, Gryder mainly dealt with her case manager. During this time, Gryder's case manager gathered medical records, received treatment updates, and managed the worker's compensation aspect of Gryder's case. Ten months after she hired Litster, Gryder spoke to Dowdle about a "demand package" to the at-fault driver's insurance company. Dowdle sent the demand in July 2017. After receiving no settlement offer in return, Dowdle filed a complaint in November 2017. Dowdle represented Gryder for approximately two years.

In about January 2019, Seth Diviney, who was working for Litster (there is a disputed allegation that he was a managing attorney for Litster), began representing Gryder. About eight months later, Diviney left Litster and formed a new law firm, IILG. Prior to his departure, Diviney and Laurie Litster Frost, owner of Litster, had been in negotiations for Diviney to purchase Litster.

However, the negotiations were unsuccessful and on September 15, 2019, apparently unbeknownst to Diviney, Laurie Litster Frost sold a portion of her ownership interest in Litster to attorneys Dan Jenkins, Paul Swainston, and Evan Mortimer. Diviney resigned from Litster the next day.

Approximately one week after Diviney resigned, Litster received a letter signed by Gryder terminating Litster's representation. At that point, Litster had not received any offers to settle Gryder's case. After firing Litster, Gryder signed a new contingency fee agreement with Diviney, now at IILG, to represent her. Notwithstanding Brown's oral representation to Gryder that she would not be charged "anything" if she terminated Litster before a settlement offer was received, Litster notified IILG and Gryder of its attorney charging lien pursuant to Section 6 of the Agreement and Idaho Code section 3-205 against any settlement or judgment in Gryder's personal injury case. Less than two months after leaving Litster and forming IILG, Diviney settled Gryder's personal injury case for $120,000.

During this time, Diviney and other former Litster employees—including members of Diviney's family—asserted a series of demands against Litster totaling hundreds of thousands of dollars. The district court noted Diviney, "[s]eemingly embittered by the circumstances prompting his departure, [ ] posted on Facebook that he is 'consumed with the need for justice' and 'ready to wield [his] focused revenge at those who devastated [his] kindly village.' " For example, in February 2020, Diviney filed a complaint against Litster under the Idaho Consumer Protection Act with the Office of the Attorney General for the State of Idaho. Diviney cited the conflict between Section 6 of the Agreement and Litster's intake specialists, who, like Brown, were trained to tell prospective clients that Litster would not charge them "anything" if the client terminated Litster before receiving a settlement offer.

The Attorney General's Office later recommended that Litster implement "certain policies to ensure it complies with the Idaho Consumer Protection Act," one of which was to make sure intake specialists are trained to "better explain . . . [Section 6]." The Attorney General also concluded that the language in Section 6 of the Agreement should be changed. The Attorney General noted Section 6 "is of particular concern" due to its use of legalese "that consumers may not fully understand" and the "contradictory statements" between Sections 1 and 6. Under Section 1, "consumers pay nothing if *Litster Frost fails* to obtain a settlement or judgment." But under Section 6, "consumers must pay Litster Frost's fees even when *another attorney* obtains a settlement or judgment for the consumer."

4

## B. Procedural Background

In December 2019, approximately one month after Gryder reached an agreement to settle her personal injury case, Litster intervened in the suit and filed a third-party verified complaint against Gryder and IILG to foreclose Litster's attorney charging lien against the settlement fund. Litster's lien included attorney fees in the amount of $48,000 (representing the previously agreed upon forty percent of the $120,000), plus costs of $2,825.46, for a total of $50,825.46 in attorney fees *and* advanced costs.

On December 30, 2019, IILG and Gryder answered Litster's complaint, and Gryder asserted a counterclaim against Litster. Approximately one month later, Gryder amended her counterclaim, specifically pleading that Litster was not entitled to any attorney fees or costs because of its violation of the Idaho Consumer Protection Act. During this time, Diviney placed the disputed portion of the settlement fund—$50,825.46—in trust. At all times during this case, Diviney concurrently represented both IILG and Gryder in their competing claims to Gryder's settlement fund. Diviney, principal and founder of IILG, represented IILG's claim to the fund by virtue of IILG's forty percent contingency fee agreement with Gryder. Diviney also purportedly represented Gryder pro bono on her ICPA counterclaim which sought to bar Litster from recovering against the fund.

After the pleading stage, a flurry of motions were filed. Notably, in February 2020, two months after Litster had filed its complaint, Litster reduced the costs component of its charging lien by $533.33. This reduced Litster's overall claimed costs from $2,825.46 to $2,292.13. Thereafter, Diviney disbursed the $533.33 from the $50,825.46 to Gryder. The remainder of the disputed fund—$50,292.13—remained in trust until Diviney later deposited it with the Clerk of the Court shortly before the bench trial.

Also in February 2020, Gryder moved for summary judgment on her ICPA counterclaim against Litster. Two months later, the district court denied Gryder's motion. Ten days after receiving the denial, Gryder filed a motion for reconsideration of issues related to the ICPA, and, alternatively, a motion for permissive appeal. The district court denied both motions. Five days later, Gryder filed a second motion for reconsideration of the same.

During this time, Litster also filed a motion to disqualify Diviney from representing Gryder on her ICPA counterclaim based on his status as a material witness and his concurrent conflict in representing both IILG and Gryder. Litster argued that Diviney had a personal vendetta against

Litster that materially impaired his ability to represent Gryder's interests. In addition, Litster produced evidence, contested by Diviney, that Diviney was "privy to and part of" Litster's "inner-workings, including confidential business practices, human resource decisions, case management strategy decisions, marketing strategies, employee training procedures and policies, and litigation strategies" during the *same time period* Gryder claimed Litster subjected Gryder to an unfair and deceptive trade practice in violation of the ICPA.

At the hearing on Litster's motion to disqualify, Diviney represented to the district court that IILG's fee agreement with Gryder in her underlying personal injury case was no longer a full forty percent contingency fee. Instead, Gryder and IILG had agreed that IILG would receive whatever is left of the disputed portion of Gryder's settlement fund after Litster takes its share (if any). In sum, Diviney represented that Gryder claimed no stake in the disputed settlement fund under her own ICPA counterclaim. When Diviney made this representation, the disputed fund totaled $50,292.13, with $48,000 comprising the disputed attorney fees, and $2,292.13 comprising Litster's claimed costs. Diviney and IILG claimed no costs against the fund—only a fee.

Approximately one month later, in July 2020, the district court denied Litster's motion to disqualify Diviney, but granted Gryder's motion for summary judgment in part on her ICPA counterclaim. In deciding to not disqualify Diviney, the district court explained that it was relying on Diviney's representations about IILG's new fee agreement with Gryder and that Gryder claimed no stake in the disputed fund. Next, the district court determined that Litster's representations to Gryder at the intake meeting contradicted the language in Section 6 of the Agreement. The district court concluded this constituted an unfair and deceptive act or practice declared unlawful by the ICPA. *See* IDAPA 0.4.02.01.032. Furthermore, the district court determined Gryder suffered an "ascertainable loss of money or property" as a result of Litster's unfair and deceptive practice because Gryder received a "materially different" deal than she had bargained for (i.e., a payment obligation to Litster that wouldn't have existed had the Agreement been as Brown represented). Thus, the district court granted Gryder partial summary judgment on the liability portion of her ICPA counterclaim.

However, the district court did not grant summary judgment on Gryder's elected remedy of rescission under the ICPA. Instead, the district court reserved the mechanics of rescission for trial to weigh the equities and avoid a windfall to IILG in light of Gryder claiming no stake in the disputed fund. Litster filed a motion to reconsider the partial grant of summary judgment to Gryder

6

and argued that it was entitled to summary judgment on Gryder's ICPA counterclaim. The district court disagreed and denied Litster's motion.

One day prior to trial, in August 2020, Litster, Gryder, and IILG filed a list of 170 stipulated and undisputed facts for trial. This list essentially described the course of events above and the tasks Litster, Diviney, and IILG completed in representing Gryder in her underlying personal injury case. The district court then conducted a bench trial to determine the value of Litster's charging lien; the mechanics of rescission under the ICPA; and the equitable division of the disputed fund between Litster and IILG. One week later, the district court issued its findings of fact and conclusions of law. In its decision, the district court made it clear that it was still relying on Diviney's representations that Gryder claimed no stake in the disputed fund, i.e., Gryder had no dispute with IILG over their competing claims to the fund. The district court then balanced the equities as between Litster and IILG.

To understand the district court's balancing of equities, it is important to note that after the trial, Litster reduced its claimed costs by $305, from $2,292.13 to $1,987.13, in its proposed findings of fact and conclusions of law. Because Diviney represented to the district court that Gryder claimed no stake in the disputed fund, the district court added this reduction to the fund to be paid to the competing firms as attorney fees (the fund increased to $48,305 instead of the original $48,000). Next, the district court found that Litster was responsible for eighty-five percent of the $120,000 settlement, and Diviney, through IILG, was only responsible for fifteen percent. Moreover, the district court concluded that rescission of the Agreement under the ICPA still required Gryder to compensate Litster for its nonreturnable legal services. Thus, the court concluded that $41,059.25 (eighty-five percent of $48,305) was an accurate measure of the reasonable value of Litster's services (under quantum meruit) and the benefit conferred on Gryder by Litster's services (under unjust enrichment).

However, the district court, exercising its discretion, reduced the fee component of Litster's lien by twenty percent ($8,211.85) because Litster had violated the ICPA. The district court reasoned it would not reduce Litster's lien further because the benefit would only be received by IILG—not Gryder. In other words, imposing any more significant consequence on Litster for violating the ICPA would cause "an "unreasonably large windfall" to IILG. The district court reasoned that the contingency fee splitting rule in *Anderson v. Gailey* between a predecessor and successor law firm prohibited such an outcome. 100 Idaho 796, 802, 606 P.2d 90, 96 (1980).

7

The district court ultimately valued Litster's charging lien at $34,834.53 (the sum of $1,987.13 for costs advanced in connection with the personal injury suit and $32,847.40 in attorney fees). The district court ordered Gryder to pay Litster that same amount as "compensation for the services it rendered" and *then* rescinded the Agreement. The disputed fund was already deposited with the Clerk of the Court so the district court ordered the release of $34,834.53 from the deposited fund to Litster in satisfaction of Gryder's judgment debt.

After the bench trial, Diviney, still representing both Gryder and IILG, moved for costs as the prevailing party, and attorney fees as a prevailing consumer under Idaho Code section 48-608(5). Although Diviney admitted Gryder incurred no "actual" attorney fees for Diviney's pro bono representation of her on her ICPA counterclaim, Diviney nevertheless claimed he and IILG should be awarded $181,247.50 in "reasonable" attorney fees. Litster also moved for fees and costs as the prevailing party. Litster sought fees in the amount of $21,402.50 based on professional services from an outside firm.

After the briefing was complete, the district court denied Diviney's request for costs and fees because Gryder was not a "prevailing" consumer. The court reasoned that Gryder only prevailed in part on her ICPA counterclaim because Litster was still entitled to a large portion of the disputed fund. The district court concluded Litster was the overall prevailing party and awarded Litster $1,621.18 in costs as a matter of right, to be paid out of the disputed fund on top of the $34,834.53 for its charging lien. However, the district court denied Litster's request for attorney fees. The district court noted Litster had represented itself throughout the entire case, with no other attorney of record outside Litster appearing for Litster until approximately two months after the bench trial. The court reasoned that pro se parties are not normally entitled to an award of attorney fees, thus, Litster's request for fees was denied. The remainder of the disputed fund ($13,836.42) was paid to IILG.

IILG and Gryder, represented by Diviney, timely filed a notice of appeal challenging the district court's division of the disputed fund, treatment of rescission under the ICPA, and denial of fees under Idaho Code section 48-608(5). Litster timely filed a notice of cross-appeal. Litster challenges the district court's grant of summary judgment for Gryder on her ICPA counterclaim, arguing that Gryder did not suffer an "ascertainable loss" as a result of Litster's unfair and deceptive practices. All parties request attorney fees and costs on appeal.

8

## II.    ANALYSIS

**A. The district court did not err in granting Gryder partial summary judgment on her ICPA counterclaim against Litster.**

Litster argues the district court erred when it granted partial summary judgment to Gryder on her ICPA counterclaim. Litster maintains that Gryder cannot, as a matter of law, show she suffered an "ascertainable loss of property or money" as a result of Litster's unfair and deceptive trade practices. Importantly, Litster does not challenge the district court's conclusion that Litster committed an unfair and deceptive trade practice in violation of the ICPA. Litster also raises an alternative argument that Gryder should be estopped from bringing her ICPA claim because Gryder did not read the Agreement (i.e., Gryder was not acting as a reasonable consumer when Litster committed an unfair and deceptive trade practice). Gryder responds by pointing to what she maintains are ascertainable losses of money as a result of Litster's unfair and deceptive trade practices in violation of the ICPA. We agree with Gryder. For the reasons set forth below, we affirm the district court's grant of partial summary judgment to Gryder on her ICPA counterclaim against Litster, but on different grounds than those adopted by the district court.

This Court exercises de novo review of a grant of summary judgment. *AED, Inc. v. KDC Invest., LLC*, 155 Idaho 159, 163, 307 P.3d 176, 180 (2013). "On appeal from the grant of a motion for summary judgment, this Court's standard of review is the same as the standard used by the district court originally ruling on the motion." *P.O. Ventures, Inc. v. Loucks Fam. Irrevocable Tr.*, 144 Idaho 233, 237, 159 P.3d 870, 874 (2007). "Summary judgment is appropriate if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (quotations omitted); *see* I.R.C.P. 56. "This Court liberally construes the record in favor of the party opposing the motion for summary judgment and draws any reasonable inferences and conclusions in that party's favor." *Robison v. Bateman-Hall, Inc.*, 139 Idaho 207, 209, 76 P.3d 951, 953 (2003).

The Idaho Consumer Protection Act "prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce within the State of Idaho." *State ex rel. Kidwell v. Master Distrib., Inc.*, 101 Idaho 447, 453, 615 P.2d 116, 122 (1980). The ICPA is "construed uniformly with federal law and regulations[,]" and it forbids "[e]ngaging in any act

or practice that is otherwise misleading, false, or deceptive to the consumer[.]" I.C. §§ 48-618, -603(17). Section 48-608(1) supplies the cause of action and available remedies for a consumer:

> Any person who purchases or leases goods or services and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by this chapter, may treat any agreement incident thereto as voidable or, in the alternative, may bring an action to recover actual damages or one thousand dollars ($1,000), whichever is the greater; provided, however, that in the case of a class action, the class may bring an action for actual damages or a total for the class that may not exceed one thousand dollars ($1,000), whichever is the greater. Any such person or class may also seek restitution, an order enjoining the use or employment of methods, acts or practices declared unlawful under this chapter and any other appropriate relief which the court in its discretion may deem just and necessary. The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper in cases of repeated or flagrant violations.

I.C. § 48-608(1). Under this provision, a consumer must prove three elements to establish a claim: (1) the consumer purchased goods or services from a seller; (2) the seller engaged in unfair or deceptive act(s) or practice(s) that are declared unlawful under the ICPA; and (3) the unfair act(s) or practice(s) caused the consumer to suffer an "ascertainable loss of money or property" (real or personal). I.C. § 48-608(1).

If a consumer proves all three elements, he or she may elect remedies. I.C. § 48-608(1). The consumer may (1) treat any agreement incident to the unfair act(s) or practice(s) as "voidable" (i.e., rescission); or (2) recover his or her actual damages—or $1,000—whichever is greater. *Id*. In addition to the elected remedy, a consumer may also seek restitution and injunctive relief. *Id*. Furthermore, the ICPA broadly authorizes a court to additionally grant "*any other appropriate relief* which the court in its discretion may deem just and necessary" to remedying the violation. *Id*. In cases of "repeated or flagrant violations" the court may even, in its discretion, award punitive damages. *Id*.

The attorney general is authorized to make rules and regulations interpreting the provisions of the ICPA and has done so through the "Idaho Rules of Consumer Protection." *See* I.C. § 48-604(2); IDAPA 04.02.01.000–.999. In those Rules, Subchapter C interprets the meaning of "an unfair and deceptive act or practice" under the ICPA and proscribes certain act(s) or practice(s) as unlawful. *See* IDAPA 04.02.01.030–.037. The Rules are described as "cumulative in effect" and "supplementary," which means that if acts or practices are governed by more than one rule,

10

compliance with one rule does not excuse violations of another applicable rule. IDAPA 04.02.01.005.

Rule 32 covers instances where a seller makes a claim or representation inconsistent with, or contradicting, written language in a contract, document, or instrument:

> It is an unfair and deceptive act or practice for a seller to make any claim or representation that is inconsistent with or contradictory to any written claim, representation, or provision which is contained in any contract, document, or instrument evidencing a transaction.

IDAPA 0.4.02.01.032.

In this case, the district court addressed Gryder's motion for summary judgment on her ICPA counterclaim against Litster three times. The district court initially denied Gryder's first motion and did not "untangle" the "Gordian knot" of unfair and deceptive acts and practices alleged by Gryder against Litster. Gryder filed a motion to reconsider, but the district court denied the motion. However, when Gryder filed a second motion to reconsider, the district court reversed course and granted partial summary judgment to Gryder. The district court acknowledged its errors in denying Gryder's initial motion and motion for reconsideration and began "anew" its analysis of all three ICPA elements.

First, the district court held the "services" element had been met—Litster had sold legal services to Gryder. Second, the district court held Litster engaged in unfair and deceptive act or practice declared unlawful under the ICPA. Specifically, the district court held Litster violated Rule 32, quoted above, but the court did not reach whether Litster also violated Rules 40, 71, and 72:

> Gryder says that Brown, the Litster Frost intake specialist, told her during her intake interview that Litster Frost "would not charge [her] anything" if she fired Litster Frost before receiving a settlement offer. Litster Frost offers no truly contrary evidence. The closest it comes is Brown's conclusory statement that he didn't knowingly or intentionally mislead, deceive, or misrepresent anything to Ms. Gryder regarding any portion of the [Agreement]. This testimony isn't a denial that he made the statement Gryder attributes to him. Consequently, it doesn't establish a genuine factual dispute about whether he made the statement. The [c]ourt must conclude as a matter of law that Brown made the statement.
> Brown's statement simply can't be squared with [Section 6]. He told Gryder she wouldn't owe anything if she fired Litster Frost before receiving a settlement offer, yet [Section 6] requires her to pay Litster Frost a fee if she recovers on her claim after terminating the attorney-client relationship[.] Because Brown's statement is a representation that directly contradicts the terms of the [Agreement],

11

Litster Frost violated Rule 32. The second element also is satisfied as a matter of law.

Finally, the district court held that Gryder suffered an "ascertainable loss of money or property" as a result of Litster's unfair and deceptive trade practice. The district court found an "ascertainable loss" by essentially reasoning that Gryder received a different guarantee or benefit than she bargained for:

> Proof of "actual damages of a specific dollar amount" is not required. [IDAPA 04.02.01.020]. Proof that "the item was different from that for which the [consumer] bargained, or that the [consumer] suffered some like loss," is sufficient. *Id*. Gryder was buying legal services. Brown told her she wouldn't have to pay for them if she terminated the attorney-client relationship before receiving a settlement offer. But now Litster Frost says, in reliance on [Section 6's] plain language, that she owes a fee even though she terminated the attorney-client relationship before receiving a settlement offer. So, the deal was materially different than Brown described it, and the difference is a payment obligation that wouldn't have existed had the deal been as represented. Any way you slice it, that's an ascertainable loss resulting from the Rule 32 violation.

However, as explained below, the district court did not point to any *actual* ascertainable loss of money or property that resulted from this difference.

On appeal, there is no dispute that Litster engaged in an unfair and deceptive act or practice under the ICPA by guaranteeing to Gryder that Litster "would not charge [her] anything" if Gryder fired Litster before receiving a settlement offer. This guarantee violated Rule 32 because it contradicts language in Section 6 of the Agreement stating that Gryder *will* be charged if she fires Litster regardless of whether she receives a settlement offer or not. The only element in dispute on appeal is whether Gryder suffered an "ascertainable loss of money or property" as a result of Litster violating Rule 32.

Here, the district court correctly found that Gryder received a different guarantee than what she bargained for and that this difference was a payment obligation to Litster that otherwise would not have existed had the deal been as Litster represented. However, this alone was not enough for the district court to conclude Gryder suffered an "ascertainable loss of money or property" under Idaho Code section 48-608(1). Gryder must show Litster's ICPA violation caused an *actual* and "ascertainable loss of money or property." *See* I.C. § 48-608(1).

For example, in *Jackson v. Woods*, the seller's unfair and deceptive acts of delivering a different gasoline brand than bargained for did not cause an "ascertainable loss of money or property" when the buyer bringing the ICPA claim nonetheless resold the gasoline for a profit. 124

Idaho 342, 343, 859 P.2d 378, 379 (Ct. App. 1993). Additionally, in *Shurtliff v. Northwest Pools, Inc.*, a consumer had received a different pool size than guaranteed by contract, but this alone was not enough to prove an "ascertainable loss of money or property" as a result of the seller's ICPA violation. 120 Idaho 263, 266, 815 P.2d 461, 464 (Ct. App. 1991). Instead, the Court of Appeals held a reduction in the total purchase price was appropriate. *Id.* at 264–65, 815 P.2d at 462–63. The homeowners put forth no evidence showing that the different pool, as built, resulted in a decreased property value, impairment of the property's use, or additional monetary expenses for the homeowners that could constitute an "ascertainable loss of money or property" under Idaho Code section 48-608(1). *Id.*

In this case, the district court erred in its reasoning because it only pointed to a different guarantee than bargained for, not an *actual* loss of money or property that was ascertainable and sustained as a result of Litster's ICPA violation. While the district court properly determined that Gryder incurred a payment obligation to Litster that was at odds with Litster's representations, the district court failed to account for the fact that Gryder also agreed to incur a payment obligation to IILG for its representation.

Nevertheless, we affirm the district court's conclusion that Gryder suffered an "ascertainable loss of money or property." The costs Litster claims against the settlement fund, on top of the disputed fee component, are an "ascertainable loss of money" to Gryder caused by Litster's unfair and deceptive act in violation of Rule 32. An "ascertainable loss of money" under Idaho Code section 48-608(1) is, amongst other things, "[a]ny deprivation" of money that "is capable of being discovered, observed, or established." IDAPA 04.02.01.020.05. Here, Gryder's ascertainable loss of money is in the costs claimed by Litster against the settlement fund.

The material facts are undisputed. Both IILG and Litster have a forty percent contingency fee with Gryder for representing her in her underlying personal injury case. Gryder settled her personal injury case for $120,000 roughly two months after following Diviney from Litster to his newly formed law firm, IILG. Initially, both Litster and IILG claimed a forty percent fee ($48,000) against the settlement fund. IILG did not claim additional costs. Conversely, Litster claimed $2,825.46 in costs on top of its forty percent fee. Litster's initial lien claim totaled $50,825.46. Because of Litster's claim of costs against the fund, Gryder initially only received $69,174.54 from her settlement fund. If Litster had not filed its charging lien, Gryder would have received $72,000 from her settlement fund because under her agreement with IILG, she only owed a forty percent

fee—not added costs. Thus, when Litster filed its complaint, Gryder was initially deprived of $2,825.46 as a result of Litster violating Rule 32.

Approximately two months after filing its complaint, Litster withdrew $533.33 from its claimed costs of $2,825.46—reducing its claimed costs to $2,292.13. In addition, after the bench trial, Litster withdrew another $305.00 from its claimed costs of $2,292.13—reducing its claimed costs to $1,987.13. Based on Diviney's representations (explained further below), Gryder only received the $533.33 in withdrawn costs. The $305.00 reduction was added to the attorney fees portion of the fund to be split between the two law firms. To this day, Gryder continues to be deprived of at least $2,292.13 out of the $72,000 she would have otherwise been entitled to had Litster not filed its attorney's charging lien in contradiction to its guarantee at intake. Therefore, Litster's Rule 32 violation caused Gryder an ascertainable loss of money under the ICPA.

Furthermore, we reject Litster's alternative argument that Gryder should be estopped from bringing her ICPA counterclaim because Gryder was not acting as a reasonable consumer during the intake meeting. On appeal, Litster argued that "Gryder's own reasonable conduct is a condition precedent to [Gryder's] ICPA claim." In support of its argument, Litster relies on IDAPA 04.02.01.030 ("Rule 30"). Rule 30 *generally* defines what may constitute "unfair and deceptive" act(s) or practice(s) under the ICPA. *See id*. In addition, Rule 30 contains language that, among other things, a seller violates the ICPA when they make a promise with the capacity or tendency to mislead "a consumer acting reasonably under the circumstances." *Id*. Litster argues that Gryder's ICPA claim is estopped by her own failure to read the Agreement during the intake meeting, i.e., Gryder did not act as a reasonable consumer would during the intake meeting. However, Litster's argument overlooks that the district court determined Litster violated a more specific rule defining "unfair and deceptive" act(s) or practice(s) under the ICPA—Rule 32.

Under Rule 32, there is no "consumer acting reasonably" language or requirement. *See* IDAPA 04.02.01.032. Moreover, the Idaho Rules of Consumer protection are cumulative, meaning compliance with one rule does not excuse violations of another applicable rule. IDAPA 04.02.01.005. Here, even if we assume Gryder was acting unreasonably for purposes of a Rule 30 violation and that Rule 30 has a reasonable consumer standard, this does not excuse Litster's violation of Rule 32. Under Rule 32, Gryder's conduct at the intake appointment is irrelevant. Therefore, we reject Litster's argument that Gryder is estopped from asserting her ICPA counterclaim.

In sum, Gryder has proven she suffered an "ascertainable loss of money" under the ICPA because Litster deprived her of at least $2,292.13 in costs she was otherwise entitled to receive had Litster not acted on its violation of Rule 32 and filed its attorney's charging lien. Accordingly, we affirm the district court's partial grant of summary judgment that Gryder established all three elements of her ICPA cause of action against Litster.

**B. The district court erred in the remedy it fashioned.**

When the district court granted summary judgment on the liability portion of Gryder's ICPA counterclaim, it reserved the mechanics of Gryder's rescission remedy under the ICPA for trial. In its findings of fact and conclusions of law, the district court determined, after balancing the equities between IILG and Litster, that Litster should receive compensation for its nonreturnable legal services as a term of rescission. The court reasoned that two different measures of relief—quantum meruit and restitution—resulted in the same total valuation of Litster's charging lien (attorney fees plus costs). The court then took that valuation, reduced the attorney fee component by twenty percent to account for Litster's ICPA violation, and ordered the reduced amount released to Litster from the disputed fund.

On appeal, Gryder argues that the district court ignored the purpose of the ICPA by allowing Litster to recover attorney fees and costs from the disputed fund. Gryder further argues that the district court erred in determining the mechanics of rescission under the ICPA and balancing the overall equities. Gryder maintains that the district court's award to Litster essentially enforces the same contractual provision the court purported to rescind: Litster's right to compensation for attorney fees in quantum meruit under Section 6 of the Agreement. Litster responds that the district court correctly decided the operation of rescission under the ICPA and did not abuse its discretion when balancing the equities. For the reasons discussed below, we conclude that the district court, though not entirely by its own doing, erred in its division of the disputed fund between Litster, IILG, *and Gryder*.

"Typically, '[t]his Court reviews the district court's rulings on equitable remedies for an abuse of discretion.' " *Turcott v. Estate of Bates*, 165 Idaho 183, 189, 443 P.3d 197, 203 (2019) (quoting *Climax, LLC v. Snake River Oncology of E. Idaho, PLLC*, 149 Idaho 791, 794–95, 241 P.3d 964, 967–68 (2010). Under this standard, we apply a four-part test to determine whether the trial court "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the

15

specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

To begin, when a consumer establishes liability under the ICPA, an assortment of remedies is available, e.g., rescission, damages, restitution, injunctive relief, punitive damages, and "any other appropriate relief which the court in its discretion may deem just and necessary." *See* I.C. § 48-608(1). However, when it comes to rescission and damages—consumers must elect one, they cannot have both. *Duspiva v. Fillmore*, 154 Idaho 27, 36, 293 P.3d 651, 660 (2013). In other words, consumers must choose between (1) treating "any agreement" incident to an ICPA violation "as voidable" (i.e., rescission); or (2) recovering "actual damages or one thousand dollars ($1,000), whichever is the greater[.]" I.C. § 48-608(1).

In this case, Gryder elected to rescind the Agreement under the ICPA. Yet, as the district court acknowledged, the *mechanics* of rescinding a contract under the ICPA is not outlined by statute or rule. *See* I.C. §§ 48-601 to -619; *et. seq.*; IDAPA 04.02.01–.999. At common law, rescission normally operates to bring the parties to their pre-contractual status quo. *O'Connor v. Harger Const., Inc.*, 145 Idaho 904, 909, 188 P.3d 846, 851 (2008); *see also Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 826 (Tex. 2012) ("[R]escission is not a one-way street. It requires a mutual restoration and accounting, in which each party restores property received from the other."). In other words, "[r]escission is an equitable remedy that totally abrogates the contract and seeks to restore the parties to their original positions." *Primary Health Network, Inc. v. State, Dep't of Admin.*, 137 Idaho 663, 668, 52 P.3d 307, 312 (2002).

For example, in *O'Connor*, the district court used its equitable authority to rescind a home construction contract based on the parties' mutual mistake regarding property access. 145 Idaho at 910, 188 P.3d at 852. To return the parties "as nearly as possible" to the position they would have been in had the contract never occurred, the district court ordered the builder to return the buyer's deposit minus an amount for materials that remained in the buyer's possession. *Id.* at 911, 188 P.3d at 854. The major problem in this case, unlike the parties in *O'Connor*, is that Gryder and Litster cannot be neatly returned to their pre-contractual positions. Litster has already provided Gryder with nonreturnable professional legal services, and Gryder's settlement of $120,000 just two months after IILG took over the case demonstrates that there was a benefit conferred by those services. However, as explained above, Litster is liable to Gryder under the ICPA. Because Gryder

16

elected, and is entitled to, rescission under the ICPA, we must now decide how that remedy operates in relation to this contract for nonreturnable professional services.

As a preliminary matter, there are some differences worth noting between rescission at common law and rescission under the ICPA. First, at common law, rescission is an equitable remedy, and as such, it is only available when "there is no adequate remedy at law[.]" *Holscher v. James*, 124 Idaho 443, 447, 860 P.2d 646, 650 (1993). In contrast, under the ICPA, a consumer may elect rescission even if there *is* an adequate remedy at law, i.e., damages. *See* I.C. § 48-608(1). Second, at common law, whether to grant rescission is within a trial court's discretion. *AED, Inc. v. KDC Invest., LLC*, 155 Idaho 159, 166, 307 P.3d 176, 183 (2013). However, under the ICPA, if a consumer establishes liability, a trial court does not have the discretion to deny rescission if a consumer elects it. *See* I.C. § 48-608(1). Thus, unlike common law rescission, whether rescission will occur under the ICPA is within the consumer's control once liability under the ICPA is proven.

Yet, these differences, alongside the absence of any guidance by statute or rule, do not diminish a trial court's authority to determine *how* rescission will occur under the ICPA. The ICPA's statutory reference to rescission—a remedy grounded in equity—is deemed, absent indication otherwise, to contain the limitations that equity typically imposes. *See Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936, 1947 (2020) (applying the same rule to the statutory "disgorgement" remedy for civil enforcement actions by the Securities and Exchange Commission). Notably, unlike other forms of relief under the ICPA, there is no indication that rescission under the ICPA, I.C. § 48-608(1), is punitive rather than remedial. *See, e.g.*, I.C. § 48-606(1)(e) (allowing for "civil penalties"); I.C. § 48-608(1) (allowing for "punitive damages"); I.C. § 48-608(2) (allowing for an "enhanced penalty" of $15,000 or treble damages, whichever is greater). Therefore, rescission under the ICPA retains its remedial nature known to equity, and as a result, includes the traditional requirement of mutual restitution. *See Cruz*, 364 S.W.3d at 826 (reaching the same conclusion for rescission under Texas' consumer protection act).

The terms of rescission and mutual restitution under the ICPA are proper subjects of a trial court's inherent authority to fashion relief and balance the equities between the parties before it. *See O'Connor*, 145 Idaho at 911, 188 P.3d at 853; *Gamblin v. Dickson*, 18 Idaho 734, __, 112 P. 213, 214 (1910). What will do equity in a particular case necessarily involves questions of fact. *O'Connor*, 145 Idaho at 909, 188 P.3d at 851; *Schmidt v. Huston*, 167 Idaho 320, 324, 470 P.3d 1129, 1133 (2016). Critically, what the party seeking rescission "ought to do, and what he must

17

do, to reinstate the other party in statu[s] quo, as a condition for repudiation and rescission, *is for the court*[.]" *Gamblin*, 18 Idaho at __, 112 P. at 214 (emphasis added). Because of this, a trial court may "impose such terms of rescission as may be deemed equitable under all of the facts in the case." *Id*. In addition, "[t]he terms upon which rescission of a transaction may be granted when complete restoration of the parties to their former position is impossible rests in the sound discretion of the courts." 17A Am. Jur. 2d Contracts § 568.

However, to not lose sight of the ICPA, the terms of rescission and mutual restitution reached in the trial court's discretion must be consistent with, and are limited by, the purpose of the ICPA. In *Master Distributors, Inc.*, this Court said the purpose of the ICPA is two-fold: (1) to protect consumers and businesses from unfair and deceptive trade practices or acts; and (2) to deter against the same. 101 Idaho at 455, 615 P.2d at 124; *see also* I.C. § 48-601. Neither protection nor deterrence is achieved if "we permit wrongdoers to retain the considerable benefits of their unlawful conduct." *Master Distrib., Inc.*, 101 Idaho at 455, 615 P.2d at 124. Accordingly, ensuring adequate enforcement of the ICPA requires "a basic policy that those who have engaged in proscribed conduct surrender all profits flowing therefrom." *Id*.

Here, in rescinding the Agreement and balancing the equities, the district court determined that Litster should be compensated for its nonreturnable legal services that led to Gryder's $120,000 settlement. In determining how to value these services, the court examined two possible alternative measures of relief—quantum meruit (a reasonable sum for services when there is no legally enforceable agreement) and unjust enrichment (the sum it would be unjust for Gryder to retain). The district court concluded that both measures produced the same $43,046.63 (attorney fees plus costs) preliminary value for Litster's charging lien:

> The [c]ourt finds above that Litster Frost's efforts are 85% responsible for the $120,000 settlement. Absent the ICPA violation, then, equity would demand that Litster Frost receive, in addition to the $1987.13 [in advanced costs] awarded above, a fee of $41,059.25—85% of the $48,305.00 left on deposit after deduction of the $1987.13. This $41,059.25 figure is appropriate whether Litster Frost's recovery is measured on a *quantum-meruit theory or an unjust-enrichment theory*. The [c]ourt finds $41,059.25 to be an accurate measure of the reasonable value of Litster Frost's services (through a deduction from that figure is warranted, as a matter of equity, because of its ICPA violation). The [c]ourt also finds $41,059.25 to be an accurate measure of the benefit conferred on Gryder by Litster Frost (though a deduction from that figure is needed to arrive at the portion of the benefit that is unjust for her to retain).

(Emphasis added.)

18

Before we address the district court's equitable balancing, we first correct the court's error in using quantum meruit to measure the value of Litster's charging lien. In this case, Section 6 of the Agreement provides that if Gryder terminates Litster before Litster obtains a settlement or judgment, Litster is entitled to the "reasonable value of its services" based on "quantum meruit" plus any advanced costs. In other words, attorney fees measured by quantum meruit is the very relief Litster is entitled to under the contract Gryder elected to rescind. By measuring Litster's charging lien in quantum meruit, the district court did not return the parties to their pre-contractual status quo. Instead, the court effectively placed Gryder and Litster in the position they would have occupied had the contract been enforced. This was inconsistent with protecting Gryder as a consumer because, in effect, it rendered her ICPA remedy of rescission a nullity. Thus, in applying quantum meruit, the district court erred because it did not act consistently with the legal standards applicable to the specific choices available to it.

Instead, the appropriate measure of relief to guide the terms of rescission under the ICPA in this circumstance was the other remedial theory the district court applied—restitution. Indeed, as explained above, rescission under the ICPA includes mutual restitution. Nevertheless, for the reasons discussed below, the district court's restitution analysis was also not consistent with the legal standards applicable to the specific choices available to it.

Restitution, also known as unjust enrichment, imposes a contractual obligation by law for "the purpose of bringing about justice and equity without reference to the intent of the agreement of the parties, and, in some cases, in spite of an agreement between the parties." *Turcott*, 165 Idaho at 190, 443 P.3d at 204 (quoting *Barry v. Pac. W. Const., Inc.*, 140 Idaho 827, 834, 103 P.3d 440, 447 (2004)). To determine if a party is entitled to restitution (in this case as a term of rescission), the district court must evaluate whether: (1) there was a benefit conferred upon one party by the other; (2) the receiving party appreciated the benefit conferred; and (3) the receiving party accepted the benefit under circumstances that would be "inequitable" for it to retain the benefit without payment to the conferring party for "the value thereof." *Turcott*, 165 Idaho at 190, 443 P.3d at 204. Importantly, the amount of relief a party is entitled to in restitution "is not the actual amount of the enrichment, but the amount of the enrichment which, *as between the two parties* it would be unjust for one party to retain." *Turcott*, 165 Idaho at 190, 443 P.3d at 204 (emphasis added) (quoting *Beco Constr. Co., Inc. v. Bannock Paving Co., Inc.*, 118 Idaho 463, 466, 797 P.2d 863, 866 (1990)).

19

In this case, the district court correctly determined that Litster conferred a benefit upon Gryder through its legal services, and that Gryder appreciated and accepted that benefit in receiving a $120,000 settlement shortly after she terminated Litster's employment. However, the district court erred when it balanced the equities and determined what portion of that benefit would be unjust for Gryder to retain. In its decision, the court weighed the equities between *IILG and Litster*, alongside Litster's ICPA violation, and reduced the attorney fees component by twenty percent from $41,059.25 to $32,847. From this, the district court determined the value of Litster's charging lien was $34,834.53 (the sum of $32,847.40 in attorney fees and $1,987.13 in advanced costs).

In reaching this conclusion—and not allowing Gryder to retain some higher percent of the disputed fund—the court balanced the equities based on the following:

- the determination that Litster's "misstatement" at intake was not committed in bad faith;
- Diviney's representations that Gryder claimed no interest in the disputed fund;
- the determination that IILG should not receive an unreasonably large windfall in the absence of Gryder claiming any interest in the disputed fund; and
- the determination that Gryder sat on her right to rescind under the ICPA for "years" while enjoying legal services from Litster.

The district court's balancing here was in error for two reasons.

First, when the district court determined how to divide the disputed fund, it balanced the equities between only *two parties*—Litster and IILG. The district court relied on Diviney's representations and omitted Gryder from the balance. But as explained in Section C, *infra*, contrary to Diviney's representations, Gryder *does* have a stake in the disputed fund. Moreover, since the beginning of this dispute, Diviney has engaged in an impermissible concurrent conflict of interest in representing Gryder on her ICPA claim. *See* Section C, *infra*. Because of this, the district court's equitable division of the fund sits on an erroneous presumption that, when corrected, materially undermines the court's determination of what benefit would be unjust for Gryder to retain. "The imposition of equitable remedies . . . requires the trial court to balance the equities *of each party*." *O'Connor*, 145 Idaho at 909, 188 P.3d at 851 (emphasis added). Here, the district court did not balance the equities of each party with a stake in the disputed fund. Thus, the district court's

equitable balancing was not consistent with the legal standards applicable to the specific choices available to it.

Second, the district court also erred when it reasoned Gryder had unjustly sat on her right to rescind the Agreement under the ICPA. As explained above, the district court's balancing rested on the notion that Gryder unjustly sat on her right to rescind for "years" and allowed Litster to "continue working for her all the while[.]" The court reasoned that "[a]s soon as Gryder signed the Contingent Fee Agreement, she had the facts necessary for her ICPA claim." This was legal error. Under the doctrine of laches, an ICPA victim may be unjustly enriched if they have accepted benefits under a contract while sitting on their right to later rescind it. *See Blinzler v. Andrews*, 94 Idaho 215, 218, 485 P.2d 957, 960 (1971) (noting that the party seeking rescission must act promptly once the grounds for rescission arise) *overruled on other grounds by Barnard & Son, Inc. v. Akins*, 109 Idaho 466, 708 P.2d 871 (1985); *see also Thomas v. Arkoosh Produce, Inc.*, 137 Idaho 352, 359, 48 P.3d 1241, 1248 (2002) (listing the elements for a defense of laches). However, laches cannot enter the balance until the right to rescission under the ICPA first arises, i.e., when the ICPA claim first accrues. *See Swafford*, 163 Idaho at 213–14, 409 P.3d at 793–94; I.C. § 48-619.

Here, Gryder did not have the right to rescission under the ICPA until her ICPA cause of action accrued. Her cause of action did not accrue until all three elements of her ICPA cause of action were satisfied. *Swafford v. Huntsman Springs, Inc.*, 163 Idaho 209, 213–14, 409 P.3d 789, 793–94 (2017); I.C. §§ 48-608, -619. Accordingly, accrual occurred once: (1) Litster sold services to Gryder; (2) Litster violated Rule 32 under the ICPA at intake; *and* (3) Gryder suffered an "ascertainable loss of money or property" as a result of Litster's violation of Rule 32. *See* I.C. § 48-608(1). As explained in Section A, *supra*, Gryder did not suffer an "ascertainable loss" as a result of Litster violating Rule 32 until Litster filed its complaint in December 2020 to foreclose its charging lien against Gryder's settlement fund. Approximately two weeks later, Gryder counterclaimed, alleging Litster committed unfair and deceptive practices or acts against Gryder. Roughly one month after that, Gryder amended her counterclaim, and specifically pleaded her ICPA cause of action against Litster. Contrary to the district court's reasoning that Gryder sat on her right to rescission, Gryder sought rescission almost immediately after her right to it arose. Thus, the district court's equitable balancing here was also not consistent with the legal standards applicable to the specific choices available to it.

21

In summary, although not solely by its own fault, the district court erred when it ordered Gryder to pay Litster $34,834.53 as a term of rescission under the ICPA. On remand, the court may not apply quantum meruit to value Litster's charging lien. Instead, the court must use restitution to determine if it would be unjust for Gryder to retain all, or part, of the benefits received from Litster's nonreturnable services. In addition, the court must consider what additional reduction is appropriate for Litster's ICPA violation. Finally, in re-weighing these overall equities, the district court must consider Litster, IILG, *and Gryder* in the balance. What portion of the disputed fund, if any, a party is entitled to recover is a discretionary call for the district court. Our point today is only in making sure that all three parties are considered.

Indeed, when the court's inherent equitable authority—and further authority under Idaho Code section 48-608(1) to provide "any other appropriate relief which the court in its discretion may deem just and necessary"—is paired with the appropriate sanction against Diviney for his impermissible conflict of interest, *see* Section C, *infra*, the district court could ultimately determine, in its discretion, that Gryder is entitled to the entire $120,000 to the exclusion of Litster, IILG, and Diviney.

## C. Diviney has an unwaivable concurrent conflict in his representation of both IILG and Gryder on her ICPA counterclaim.

The circumstances of this case require us to next address Diviney's unwaivable concurrent conflict present on appeal, and throughout this case below. Since Litster filed its complaint to foreclose its charging lien, IILG, Gryder, and Litster have all had competing claims on how to distribute the settlement fund. At all times, Diviney represented IILG *and* Gryder in their claims against the fund. However, Gryder's claim to the fund, under her ICPA cause of action, is directly adverse to IILG's interest in receiving a full forty percent attorney fee from the fund. To preserve the integrity of this Court, and the district court below, we cannot ignore Diviney's conflict of interest.

### 1. Courts may raise a potential conflict of interest *sua sponte*.

"The Idaho Constitution created the judicial branch of government in Idaho and vested in the judiciary certain powers." *Talbot v. Ames Const.*, 127 Idaho 648, 651, 904 P.2d 560, 563 (1995) (citing Idaho Const. art. II, § 1; art. V, §§ 2, 13). "The regulation of the practice of law is an inherent power of the judiciary[,]" *Pichon v. Benjamin*, 108 Idaho 852, 854, 702 P.2d 890, 892

(1985), and "ultimately of the Supreme Court, of this State[.]" *Kyle v. Beco Corp.*, 109 Idaho 267, 271, 707 P.2d 378, 382 (1985).

Accordingly, this Court, and the trial courts of this State, have the inherent power to raise a potential conflict of interest *sua sponte*, and to prevent an attorney from improperly representing adverse or conflicting clients. *See, e.g.*, *In re Marriage of Wixom & Wixom*, 332 P.3d 1063, 1075 (Ct. App. Wash. 2014); *Bentz v. Bentz*, 37 A.D.3d 386, 387 (N.Y. 2007); *Seifert v. Dumatic Indus. Inc.*, 197 A.2d 454, 456 (Pa. 1964); *Akron v. Carter*, 942 N.E.2d 409, 416 (Ohio Ct. App. 2010); *O'Connor v. Jones*, 946 F.2d 1395, 1399 (8th Cir. 1991); *United States v. Coleman*, 997 F.2d 1101, 1104 (5th Cir. 1193); *Cohen & Thiros v. Keen Enter.,* 44 B.R. 570, 574–75 (N.D. Ind. 1984); *In re Kelton Motors, Inc.*, 109 B.R. 641, 650 (Bankr. D. Vt. 1989);  *Estate of Andrews by Andrews v. United States*, 804 F.Supp. 820, 824 (E.D. Va. 1992); *Yates v. Applied Performance Tech., Inc.*, 209 F.R.D. 143, 152, 154 (S.D. Ohio 2002); *Cramer v. Chiles,* 33 F.Supp.2d 1342, 1346 n.2 (S.D. Fla. 1999); 7A C.J.S. Attorney & Client §§ 210, 211; *see also VIII. Sanctions*, 94 HARV. L. REV. 1470, 1480 (1981) (citing cases). Courts are not required to sit back and wait for one of the parties to raise the conflict. Nor must courts turn a blind eye when parties gamble with conflict-laden representation that our ethical rules forbid.

We have the power, right, and duty to safeguard ethical practices of attorneys in this State—even in the exceedingly rare circumstance a conflict of interest presents itself on appeal. *See, e.g.*, *In re Marriage of Wixom & Wixom*, 332 P.3d at 1075 (resolving a conflict of interest *sua sponte* on appeal). Our ethical rules governing the practice of law are found in the Idaho Rules of Professional Conduct. These Rules prohibit a lawyer from representing a client in certain circumstances when a concurrent conflict of interest exists:

> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>> (1) the representation of one client will be *directly adverse* to another client; or
>> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by the personal interest of the lawyer, including family and domestic relationships.
> (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer *reasonably believes* that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the *same litigation* or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

I.R.P.C. 1.7 (emphasis added).

In this case, below and on appeal, Diviney was the attorney for IILG in its claim against the fund and for Gryder in connection with her ICPA counterclaim. However, IILG and Gryder have "directly adverse" claims to the settlement fund that create an unwaivable concurrent conflict of interest for Diviney under Rule 1.7(a)(1). IILG has a claim to the fund based on its forty percent contingency fee agreement with Gryder for representing her in her underlying personal injury suit. In addition, Gryder has a competing claim to the fund under her ICPA counterclaim. Under Gryder's ICPA claim, not only may she seek rescission, she may also pray for the trial court to use its broad equitable powers and award "any other appropriate relief which the court in its discretion may deem just and necessary." I.C. § 48-608(1). Because of this, Gryder's ICPA claim necessarily includes claims that Litster should be barred from any recovery in equity; that Gryder—not IILG— should be entitled to retain the portion of the fund Litster would otherwise be entitled to; and that IILG's claim to the fund should be proportionately reduced to avoid a windfall for only partial performance. Therefore, Gryder's ICPA claim inherently includes claims directly adverse to both Litster *and IILG*.

To explain further, an unconflicted attorney might claim that one form of appropriate relief, in addition to rescission, would be to reduce Diviney's (and accordingly IILG's) fee in the underlying personal injury suit based on the contingency fee splitting rule in *Anderson v. Gailey*, 100 Idaho 796, 606 P.2d 90 (1980). Indeed, at a hearing below, Diviney explicitly cited *Anderson* as the applicable case to decide a fee dispute between a predecessor and successor law firm who both have a contingency fee with the same client but there is one settlement fund. Moreover, in its conclusions of law balancing the equities between Litster and IILG, the district court also relied on *Anderson* where we held, in a similar context, that attorneys "should not reap the windfall of receiving a full fee for only part performance." 100 Idaho at 802, 606 P.2d at 96.

24

Rather than washing his hands of his own culpability, a conflict-free attorney could also point, in equity, to Diviney's alleged role as a managing attorney at Litster *during the time Litster subjected Gryder to the unfair and deceptive practice*. Litster submitted evidence, contested by Diviney, that Diviney was "privy to and part of Litster Frost's 'inner-workings,' including confidential business practices, human resource decisions, case management strategy decisions, marketing strategies, employee training procedures and policies, and litigation strategies." More specifically, Litster presented evidence that Diviney was a managing attorney at Litster during the same time Litster committed the unfair and deceptive practice against Gryder. Had Gryder been represented by conflict-free counsel on her ICPA cause of action, she would have had the opportunity to at least investigate Diviney's personal responsibility for, and involvement in, Litster's unfair and deceptive practices. Instead, Gryder was represented by Diviney himself.

Furthermore, conflict-free prosecution of Gryder's ICPA cause of action may have even led to Gryder seeking punitive damages against Litster—and Diviney as an alleged managing attorney—if she could show Litster and Diviney engaged in "repeated or flagrant" violations of the ICPA. *See* I.C. § 48-608(1). Although contested by Litster, Diviney himself contended throughout this litigation, that Litster's unfair and deceptive intake act against Gryder was an ongoing, "deliberate," and "intentional" intake *practice* by Litster—while at the same time absolving himself from any involvement.

In representing Gryder on her ICPA claim, Diviney did not raise the above arguments against himself, or his other client, IILG—nor would we expect him to given his own conflicted interests. Neither do we decide whether these aspects of Gryder's ICPA claim would have prevailed. Instead, we merely highlight the harm Diviney's concurrent conflict has caused to Gryder's interests in her own ICPA cause of action, and to the integrity of the judicial process itself. We hold that Diviney's concurrent representation of Gryder on her ICPA cause of action is directly adverse to his concurrent representation of IILG. From the time Litster filed its complaint and through to this appeal, Diviney has been engaged in a concurrent conflict of interest prohibited by Rule 1.7(a)(1).

Finally, despite Diviney's assertion below that any conflict was waived, we note that the concurrent conflict here is unwaivable for at least two reasons. First, as a matter of law, Diviney could not "reasonably" believe that he could actually provide "competent and diligent" representation to both IILG and Gryder when *Diviney* was allegedly responsible in part for the

same unfair and deceptive trade practices Gryder complains of under her ICPA claim. Thus, Diviney cannot satisfy paragraph (b)(1) under Rule 1.7 in order for Gryder to waive the conflict. Second, as explained above, Gryder's ICPA cause of action necessarily involves claims directly adverse to IILG's interest in collecting a full forty percent contingency fee from the fund. Thus, Diviney cannot satisfy paragraph (b)(3) under Rule 1.7 to waive any conflict with Gryder. Diviney's concurrent representation involves the assertion of a claim by one client (Gryder) against another client (IILG) in the same litigation.

Before addressing how to remedy Diviney's unwaivable concurrent conflict, we pause to explain how Diviney avoided disqualification due to no fault of the district court. Early on, the district court alerted the parties that if the division of the settlement fund must be litigated, Diviney would likely be a material witness and should "carefully consider whether he is ethically able to proceed with representation." Litster later moved to disqualify Diviney from representing Gryder on her ICPA counterclaim based on Diviney's status as a material witness *and* his concurrent conflict.

Litster argued that Diviney has a personal vendetta against Litster that prevents him from representing Gryder's interests under Idaho Rule of Professional Conduct 1.7(a)(2). The district court rejected this argument. The court reasoned that Rule 1.7(a)(2) does not disqualify Diviney from representing Gryder on her ICPA counterclaim because Diviney's personal "vendetta" against Litster does not materially limit his ability to represent Gryder. In addition, for reasons explained below, the court determined that there was no "dispute" between Gryder and IILG. Finally, the court determined that even if Diviney does have a concurrent conflict under Rule 1.7(a)(2), Gryder's written waiver signed and submitted in response to Litster's motion allowed Diviney's representation of Gryder.

Critically, the district court reached its conclusions based *solely* on a judicial admission by Diviney that Gryder had disclaimed any stake in the settlement fund under her ICPA counterclaim. "A judicial admission is a deliberate, clear, unequivocal statement of a party about a concrete fact within the party's peculiar knowledge, not a matter of law . . . . [and] not opinion." *In re Universe Life Ins. Co.*, 144 Idaho 751, 759, 171 P.3d 242, 250 (2007). During the hearing on Litster's motion to disqualify, Diviney made deliberate and unequivocal representations to the district court that Gryder had agreed that IILG's attorney fee in the underlying personal injury suit would *not* be a full forty percent contingency fee. Rather, it would be whatever was left of the disputed settlement

26

fund after any disbursement to Litster. In other words, Diviney made a statement of concrete fact that Gryder claimed no stake in the fund under her ICPA counterclaim against Litster's *or IILG's* competing claims to the disputed fund.

From this, the district court reasoned there was no concurrent conflict between IILG and Gryder because only IILG and Litster had a stake in the fund:

> While Diviney indeed appears to have it out for Litster Frost, [] there is no apparent adverse effect on Gryder. She's a nominal party, given Diviney's assertion that she has already received her share of the settlement proceeds and will owe [IILG] nothing beyond what's left of the settlement proceeds after any award to Litster Frost on its lien claim. So, Diviney is fighting for his own interests as the principal of [IILG], but that's fine because Gryder has nothing at stake. True, if Litster Frost prevails, a modest award of costs could be entered against her, but the award also would be entered against [IILG], which can be expected under the circumstances to pick up the tab. An award of attorney fees against Gryder is possible but seems unlikely, and the burden of any such award is likely to be borne by [IILG] in any event. Gryder having nothing at stake, Litster Frost hasn't shown that Diviney has a conflict of interest under [Idaho Rule of Professional Conduct] 1.7(a).

Furthermore, the sole reason the district court accepted Gryder's written waiver was based on Diviney's same representation that Gryder disclaimed any stake in the fund: "Diviney's belief that he can provide diligent and competent representation is reasonable, given Gryder's nominal-party status." However, on appeal, Diviney contradicted the sole reason he was not disqualified below. In response to Litster's cross-appeal challenging whether Gryder suffered an "ascertainable loss" under the ICPA, Diviney argued, at oral argument and in his briefing, that Gryder *does* have a stake in the fund. More specifically, Diviney conceded that Gryder, under her ICPA claim, is entitled to receive the advanced costs that were claimed by Litster on top of its forty percent contingency fee. Thus, in his representations before this Court, Diviney materially undermined the sole reason the district court did not disqualify him below. The buck stops here.

2. **The appropriate sanction for Diviney's unwaivable concurrent conflict is to be determined by the district court on remand after a hearing.**

Although it is a power seldom used, this Court has the inherent power to sanction those who appear before us. *Talbot*, 127 Idaho at 652, 904 P.2d at 564; *Riggins v. Smith*, 126 Idaho 1017, 1022, 895 P.2d 1210, 1215 (1995); *Loughmiller v. Interstate Farmlines, Inc.*, 107 Idaho 179, 179–80, 687 P.2d 569, 569–70 (1984)). If there is conduct that can be adequately addressed through the sanctions allowed under the appellate rules, we ordinarily rely on Idaho Appellate Rule 11.2 rather than our inherent power. *See Talbot*, 127 Idaho at 652, 904 P.2d at 564. However, if "in [our]

27

informed discretion" the rules are not "up to the task," we "may safely rely" on our inherent power to sanction. *Talbot*, 127 Idaho at 652, 904 P.2d at 564 (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991)). Resolving a potential conflict of interest, and determining the appropriate sanction when a conflict exists, is precisely the kind of ethical question that this Court, and trial courts, may properly address. *See Hepworth Holzer, LLP v. Fourth Jud. Dist. of State*, 169 Idaho 387, __, 496 P.3d 873, 880 (2021).

When an impermissible conflict of interest exists, there are two types of sanctions a court should generally consider: (1) disqualification; and (2) disgorgement and/or forfeiture of attorney fees. These sanctions are not mutually exclusive. Nevertheless, a court's discretion in determining the appropriate sanction must be geared towards shaping a remedy which will assure fairness to the parties, the integrity of the judicial process, and whenever possible, to reach a solution that is least burdensome to the client. *Hepworth Holzer, LLP*, 169 Idaho at __, 496 P.3d at 881.

Disqualifying an attorney from representing a client is the "favored" form of sanction for enforcing conflict rules amongst jurisdictions "because it is generally perceived to be a prophylactic device." *VIII. Sanctions*, 94 HARV. L. REV. 1470, 1470 (1981) (discussing the sanctions available to enforce ethical conflict rules); *see also Sanctions for Attorney's Representation of Conflicting Interests*, 57 COLUM. L. REV. 994, 995–96 (1957). Idaho Rule of Professional Conduct 1.7(a) favors the same where it provides that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest." However, disqualification, to be an effective sanction, is generally more appropriate near either the onset of the litigation, or upon "promptness and reasonable diligence" once the facts for disqualification have become known. *See Weaver v. Millard*, 120 Idaho 692, 698, 819 P.2d 110, 116 (Ct. App. 1991).

As an alternative or additional sanction, an attorney who engages in an impermissible conflict may be disgorged, and/or required to forfeit, any attorney fees for their conflict laden representation. This principle is an ancient one, required for the ethical practice of law since at least the early 1600's:

> [B]y the beginning of the Seventeenth Century it had become a common-place that an attorney must not represent opposed interests; and the usual consequence has been that he is debarred from receiving any fee from either, no matter how successful his labors. Nor will the court hear him urge, or let him prove, that in fact the conflict of his loyalties has had no influence upon his conduct; the prohibition is absolute and the consequence is a forfeiture of all pay.

28

*Silbiger v. Prudence Bonds Corp.*, 180 F.2d 917, 920–21 (2d Cir. 1950) (L. Hand, C. J.).

The "honor of [our] profession," and the "due administration of justice" is implicated when a lawyer breaches his fiduciary duty to a client by engaging in an impermissible conflict of interest. *Hatch v. Fogerty*, 10 Abb. Pr. 147, 162 (N.Y. Super. 1871). "[A]ny taint" upon that lawyer "will cast its shadow in some degree upon the collective body of his associates at the bar." *Id.* This not only injures the integrity of the legal profession and does a disservice to the public and the courts, but it also runs the risk of subverting the justice system. *See In re Marriage of Wixom & Wixom*, 332 P.3d at 1074; *Int'l Bus. Machines Corp. v. Levin*, 579 F.2d 271, 283 (3rd Cir. 1978). "Uncompromising rigidity" is often the necessary attitude to ensure the conduct of fiduciaries be "kept at a level higher than that trodden by the crowd." *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928) (Cardozo, C.J.).

The United States Supreme Court has said that a fiduciary "may not perfect his claim to compensation by insisting that although he had conflicting interests, he served his several masters equally well or that his primarily loyalty was not weakened by the pull of his secondary one." *Woods v. City Nat. Bank & Tr. Co. of Chicago*, 312 U.S. 262, 269 (1941). Accordingly, "[c]ourts throughout the country have ordered the disgorgement of fees paid or the forfeiture of fees owed to attorneys who have breached their fiduciary duties to their clients by engaging in impermissible conflicts of interests." *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*, 602 A.2d 1277, 1285 (Pa. 1992) (citing cases). To be sure, procedural due process generally requires notice and opportunity to be heard before imposing sanctions for an attorney's conflict laden representation. *See Hepworth Holzer, LLP*, 169 Idaho at ___, 496 P.3d at 883. "The total denial of such ordinary protections results in a denial of due process which is antithetical to our system of justice." *Id.*

In *Parkinson v. Bevis*, we set out the standard for disgorgement or forfeiture of an attorney's fee when he or she breaches fiduciary duties to a client. 165 Idaho 599, 608, 448 P.3d 1027, 1036 (2019). To determine whether all or a portion of an attorney's fee is subject to this "sanction" for an impermissible conflict of interest, a court must weigh four criteria: "(1) the extent of the misconduct, (2) whether the breach involved knowing violation or conscious disloyalty to a client, (3) whether forfeiture is proportionate to the seriousness of the offense, and (4) the adequacy of other remedies." *Id.* at 607, 448 P.3d at 1035 (citing The Restatement (Third) of the Law Governing Lawyers, § 37). To be clear, when applying these factors, and issuing this form of

sanction, a court is not determining whether an attorney has engaged in *professional misconduct* under the Idaho Rules of Professional Conduct.

Here, we decline to exercise our power on appeal to sanction Diviney directly because procedural due process requires that the district court determine the appropriate sanction for Diviney's conflict after a hearing on remand. On remand, the district court must determine, under the principles above, what overall sanction will assure fairness to the parties, the integrity of the judicial process, and, if possible, is least burdensome to Gryder's interests.

We note that the cost of disqualifying Diviney from representing Gryder on her ICPA claim may, at this stage, outweigh any benefits Gryder would receive from conflict-free counsel. It has been nearly six years since Gryder's underlying personal injury occurred, the parties have been disputing the distribution of Gryder's personal injury settlement for over two years, one trial has already occurred, and a judgment against Gryder has been entered. Moreover, Diviney and IILG's right to compensation in Gryder's underlying personal injury case is materially entwined with Gryder's right to deny Diviney and IILG a fee for the same under Gryder's ICPA cause of action. Thus, the district court may appropriately require that Diviney forfeit, and disgorge himself of, any fee owed to him by Gryder in her underlying personal injury claim *and* on her ICPA counterclaim after determining how to equitably distribute the disputed portion of Gryder's settlement fund.

However, we do not presume to know what sanction will be appropriate in the district court's discretion, or what sanction Gryder might argue for on remand. It is possible that Gryder may argue fairness and the integrity of the judicial process requires time for her to acquire conflict free counsel; to investigate Diviney and Litster for "repeated or flagrant" violations of the ICPA to add punitive damages to her ICPA claim; and to present such evidence in a new trial.

In sum, from the genesis of this dispute, Diviney has engaged in an impermissible concurrent conflict of interest by representing two directly adverse parties (Gryder and IILG) in the same litigation. Under the above principles, and after a hearing on remand, we direct the district court to determine the appropriate sanction to remedy Diviney's ethical violation.

**D. IILG failed to show how the district court abused its discretion in denying fees below.**

IILG argues the district court abused its discretion in declining to award reasonable attorney fees under Idaho Code section 48-608(5) for its representation of Gryder on her ICPA counterclaim because she was a prevailing consumer. Whether a consumer is a prevailing party is determined by the district court through the prevailing party analysis in Idaho Rule of Civil

30

Procedure 54(e) and 54(d)(1)(B). *Israel v. Leachman*, 139 Idaho 24, 26–27, 72 P.3d 864, 866–67 (2003). A district court's decision to deny attorney fees is reviewed under the abuse of discretion standard. *Stout v. Key Training Corp.*, 144 Idaho 195, 196, 158 P.3d 971, 972 (2007). To determine if the district court abused its discretion, we apply the four-part test from *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

Here, IILG, through Diviney, did not charge Gryder for representation on her ICPA counterclaim. Nevertheless, IILG, through Diviney, argued below that it was entitled to a "reasonable" attorney fees in bringing Gryder's ICPA claim instead of its actually "incurred" fee (which was nothing). IILG requested $181,247.50 in "reasonable" attorney fees. The district court denied IILG's request after it concluded that Gryder was not the prevailing party, reasoning that Gryder achieved only some success on her ICPA claim. While we have serious doubt as to whether IILG would be entitled to any attorney fees because of the conflict of interest issue discussed at length, the simpler answer here is that IILG has failed to provide any argument as to how the district court abused its discretion in denying Gryder prevailing consumer status and has not pointed to any particular part of the four-part abuse of discretion test under *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018). "[S]uch a conclusory argument is fatally deficient to [a] party's case." *Est. of Ekic v. Geico Indem. Co.*, 163 Idaho 895, 899, 422 P.3d 1101, 1105 (2018) (quoting *State v. Kralovec*, 161 Idaho 569, 575 n.2, 388 P.3d 583, 589 n.2 (2016) (internal quotations omitted)). Accordingly, because IILG did not argue how the district court abused its discretion, we affirm the district court's denial of fees.

### E. Attorney fees and costs on appeal.

On appeal, Gryder, through Diviney as counsel, requested reasonable attorney fees as a prevailing consumer under Idaho Code section 48-608(5). Here, Gryder is a prevailing consumer on appeal because we affirm the district court's conclusion that Gryder established her cause of action under the ICPA and vacate the judgment awarding a large portion of her settlement fund to Litster. However, Diviney provided Gryder with conflict laden representation on her ICPA claim on appeal, and it is unclear whether Gryder has incurred any attorney fees on appeal. Furthermore, on remand, the district court could determine that the appropriate sanction for Diviney's impermissible conflict is forfeiture and disgorgement of any fees in his representation of Gryder on her ICPA claim, her underlying personal injury suit, or both. In that case, there would be no need to award Gryder attorney fees on appeal because Diviney would be prohibited from collecting

any from Gryder. Thus, in these unique circumstances, we decline to determine whether to award Gryder fees on appeal under Idaho Code section 48-608(5) and instruct the district court to resolve this matter, if needed, after resolution of the sanctions issue below.

Finally, Litster asks for attorney fees on appeal under Idaho Code section 12-121. Attorney fees may be awarded on appeal under section 12-121 to the prevailing party or parties. I.C. § 12-121; *Armand v. Opportunity Mgmt. Co.*, 155 Idaho 592, 602, 315 P.3d 245, 255 (2013). The "prevailing" party in an action is determined from an "overall view, not a claim-by-claim analysis." *Choice Feed, Inc. v. Montierth*, 168 Idaho 124, 152, 481 P.3d 78, 106 (2021). Here, Gryder is the only, and overall, prevailing party on appeal. Thus, Litster is not entitled to fees under section 12-121. Furthermore, because Gryder is the only prevailing party, IILG and Litster shall carry their own costs on appeal and split any costs incurred by Gryder.

## III.    CONCLUSION

We affirm the district court's grant of summary judgment in part to Gryder on the liability portion of her ICPA counterclaim, but we reverse the district court's decision after the bench trial dividing the disputed fund between Litster and IILG. Accordingly, we vacate the district court's judgments valuing Litster's charging lien at $34,834.53 and awarding Litster an additional $1,621.18 in costs as the prevailing party below against the disputed fund.

We remand this case for further proceedings, with additional instructions that the district court determine, after a hearing, the appropriate sanction for Diviney's impermissible concurrent conflict of interest.

Chief Justice BEVAN, and Justices STEGNER, MOELLER, and ZAHN, CONCUR.