# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 52242

THE ESTATE OF LAUREL ANN KALINSKI
through the Personal Representative
CRYSTAL MARIE KALINSKI,

    Plaintiff-Appellant,

v.

MURPHY LAW OFFICE, PLLC, an Idaho
professional limited liability company;
MICHAELINA BRADY MURPHY, a real
person,

    Defendants-Respondents,

and

DOES 1 through 10,

    Defendants.

Boise, February 2026 Term

Opinion Filed: May 5, 2026

Melanie Gagnepain, Clerk

---

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Cynthia Yee-Wallace, District Judge.

The judgment of the district court is affirmed.

Smith Horras, P.A., Boise, for Appellants. William L. Smith argued.

Duke Evett, PLLC, Boise, for Respondents. Emma C. Nowacki argued.

---

MEYER, Justice.

This is an appeal from an order granting summary judgment in favor of Murphy Law Office, PLLC, and Michaelina B. Murphy (Murphy) on all claims brought by the Estate of Laurel A. Kalinski, through its personal representative, Crystal M. Proctor, formerly known as Crystal M. Kalinski (the Estate). The Estate alleged causes of action for negligence or legal malpractice, breach of contract, violation of the Idaho Consumer Protection Act (ICPA), and unjust enrichment. On appeal, the Estate challenges only the dismissal of the unjust enrichment and ICPA violation claims. We affirm because unjust enrichment is not a cause of action independent from the Estate's

legal malpractice claim since they were both based on the same alleged misconduct. In addition, the Estate failed to show evidence of unfair or deceptive acts as required by the ICPA.

## I. FACTUAL AND PROCEDURAL BACKGROUND

**A. Factual Background.**

Laurel Kalinski passed away in August 2019, leaving her children, Crystal and Nicholas Kalinski, as her sole heirs. The Estate consisted of only two assets: a Jeep and a house in Nampa, Idaho (the Property), where Crystal shared a home with her mother. Laurel's final months were shadowed by stage 4 cancer, medical bills, and increasing debt on her car and house. Despite that, Crystal and Nicholas received "significant life insurance proceeds and retirement accounts" outside of the Estate, which were "[j]ust under a half million dollars."

Laurel's Will named Crystal as the personal representative of the Estate, directed that the Property and the vehicle be sold, the debt on each paid, and the residue used to pay other debts before splitting whatever remained equally between Crystal and Nicholas. To navigate probate, Crystal, as personal representative, initially hired the attorney who drafted Laurel's Will to advise and represent the Estate.

After the Jeep was repossessed by the lienholder, Crystal and Nicholas were referred to Murphy, another attorney, by an accounting firm. On November 14, 2019, Murphy met with them for a consultation. Before meeting with Murphy, Nicholas agreed that Crystal could remain on the Property, refinance it, and pay him half the equity upon the Estate's settlement. To avoid selling the Property, the siblings agreed to use their insurance proceeds to pay Laurel's debts and Murphy's fees, each paying half. Crystal and Nicholas completed a one-page intake form at Murphy's office. When they met with Murphy, Crystal and Nicholas explained their agreement with Murphy, but they did not mention the exact terms, such as the Property's value and the amount Crystal would owe Nicholas. Crystal, as personal representative, then hired Murphy as counsel for the Estate, who filed a substitution of counsel to replace the previous attorney of record in the probate proceedings. Once retained, Murphy sent letters and notices to creditors, including the Idaho State Tax Commission, a credit card company, and Laurel's medical providers.

On July 15, 2020, Crystal sent Murphy an email itemizing the expenses she incurred in connection with the Estate. Crystal attached a broker's valuation of the Property, a list of repairs to get the Property in selling condition, and a list of "expenses for the estate." Those expenses

2

included carpet cleaning, plumbing, tree removal, kitchen blinds, and surgery for their mother's dog. In that email, Crystal also wrote:

> My brother knows some information about the next steps but not all. I've kind of played dumb with him to avoid conflict and told him that I needed to get a list of expenses for the estate together and that you had a formula to figure out the fair payment for him for the house. He's separating from his wife and has leaned on me for support. He owes me $11,000 (which he knows, agreed to, and I have in text from him) that is going to come out of his payout from the house.
>
> I'm happy to answer any questions or discuss anything further before inviting him in to be part of the closing. I want to keep the relationship with my brother in the state it's in and as long as he doesn't think I'm going behind his back at all, we should be fine. I don't think he'll give much of a fight when it comes to the payout when it's explained during closing.

Crystal claims that this email excerpt was a privileged, confidential communication.

On September 30, 2020, Crystal sent Murphy an email outlining her proposal for valuing the Property. Both Crystal and Nicholas had expended the funds from Laurel's non-probate assets. Crystal suggested using the Property's assessed tax value of $230,000 at the time her mother passed away. From this amount, she suggested deducting the Estate's total debts and expenses of $130,616.13. After these deductions, the remaining value totaled $80,983.87. Crystal then suggested dividing the amount by two, resulting in each party receiving $40,491.94. She stated she would deduct $12,000 from Nicholas' share to settle the debts he owed Crystal. This would result in a payout of $28,491.94 to him.

Crystal and Nicholas met with Murphy on October 1, 2020, to discuss the Estate. At the meeting, Murphy shared Crystal's July 15, 2020, email with Nicholas, who was angered by it. The siblings did not agree on the Property's value. Nicholas contended that he was entitled to half the value of the Property based on fair market value at the time Crystal refinanced the Property "minus the mortgage and estate debts split in two." Crystal maintained that the proper valuation was based on the Property's 2019 tax assessment at the time of Laurel's death, which was $230,000. Afterward, Nicholas stopped paying his share of Murphy's attorney fees. By the end of October, Crystal told Murphy that Nicholas admitted they would never agree on what's fair. Murphy replied, "I hate to say I was right, but [what would be] [f]air to him would be for you to sell [the Property] and he gets half with no deductions."

Nicholas hired an attorney, Mike Kulchak, who sent a letter to Murphy on November 4, 2020, stating that Nicholas did not accept Crystal's $28,000 offer for his interest in the Property.

3

Nicholas wanted the Property sold and the proceeds divided as directed in the Will. Kulchak requested an accounting and inventory of the Estate and informed Murphy that it was not possible for Crystal to retain the Property unless she had sufficient funds to pay Nicholas the proceeds from any sale. Kulchak also disputed the existence of any previous agreement between the siblings regarding the Property.

Murphy forwarded Crystal the email communications between Murphy and Kulchak. Crystal responded, "I'm not actually going to have to sell, am [I]?" Murphy answered:

> Let's see how aggressive they are. I am going to buy time by getting together the [i]nventory and the accounting . . . . I would suggest, however, that you work closely with [the lender] to make sure that the moment you qualify, we can have you buying the home.

A member of Murphy's staff also responded:

> [Y]es, you wouldn't *have* to sell the house if you were able to pay the debt on it and be able to split the "value of the house" as instructed in the Will (however that gets done). It's the determining of the value, etc., that has become the issue, as you know.

By March 2021, despite her efforts to do so, Crystal was unable to refinance the Property. However, on May 20, 2021, Crystal informed Murphy that she believed she would qualify for financing by the end of June.

On July 9, 2021, Crystal emailed Murphy, "I've been talking with [the lender] about refinancing and we're thinking we can be refied [sic] by the end of the month! We finally have our ducks in a row. I think I'm planning on sticking with the 40K minus 1/2 of the dues for you guys." Murphy asked, "Have you and Nick agreed to a price for the house?" and Crystal replied, "Not officially. He had agreed to 40K at one point but wanted the money right then."

On July 15, 2021, Kulchak emailed Murphy: "On behalf of my client, a request was made that the home be sold and the proceeds be divided. Please advise as to your client's position. If necessary we will file a motion for the home to be sold with the court." Murphy responded, "[A]ccording to my client, your client and my client have reached a few agreements and she is in the process of receiving lending to buy your client out. Is this not your understanding?" In response to Kulchak's question, "What is your understanding of the 'agreements?'" Murphy explained:

> [T]he house is worth around $425,000.00. There is a $105,000 mortgage and another FHA second for $8,695.89 for unpaid payments. Your client has authorized a $40,000.00 credit to his sister for the amounts he has borrowed against his inheritance from her or for costs she put into the [E]state to preserve the assets, pay

4

debts etc. (only as to his ½ interest). Crystal paid the Idaho Tax Commission lien ($8,105.34). I think there is still an outstanding St. Luke's claim ($4,211.83).

So, if the market value is $425,000.00 and approximately $114,000.00 will [be] paid at closing to cover the mortgages, this will give the Estate approximately $311,000.00 after closing (no real estate taxes, closing costs, etc are included). Of that $4211.83 must be paid to St. Lukes. So approximately $306,000 will go to the heirs. This means that each heir would be entitled to approximately $153,000.00. Your client has agreed to a credit of $40,000.00 which means his sister would pay all encumbrances and her brother the balance of his one half.

This is very rough and I cannot guarantee any of these numbers are correct. This is just to illustrate what I believe the parties have discussed. There are also outstanding attorney fees that need to be paid. There may be other Estate expenses that may exist that I have not determined during my quick review to become reacquainted with the file.

On July 20, 2021, Crystal asked Murphy if she should continue with the refinance plan, asking, "Does [Nicholas] have to be involved with any of it? Do I still have to provide a breakdown of everything in the meantime or can we just continue and finish the refinance, close the [E]state and set up the trust?" Murphy's legal assistant responded, "Do not stop the refinancing process. Keep going and get it done. Nick does not have to be involved in that."

On July 26, 2021, Crystal refinanced the Property for $193,000. Acting as personal representative, she transferred the title to herself and her new husband, Tanner Proctor. The amount refinanced covered Laurel's current loan, closing costs and fees, FHA loan payoff, Nicholas' projected payout of $40,000, and some unpaid attorney fees incurred by the Estate. The loan proceeds also helped pay for Crystal's wedding. The deed to Crystal was recorded on July 30, 2021.

On August 2, 2021, Crystal emailed Murphy stating that she was unaware that the market value of the house would be based on the value in 2021:

I met with Nick Saturday night. He told me that you guys emailed his attorney and told them that I agreed to basing the house off of market value now. You never discussed any of that with me and I certainly never agreed to those numbers. Why would you do that?

I have told you every step of the way what was going on with the refinancing and what numbers I was going off of (being the numbers you recommended in the beginning of house value at time of death). During the refinance I had been planning on giving Nick 40k minus attorney fees and the FHA loan. I don't understand why you would tell him I agreed to anything different.

I also don't understand why you would tell me to go have a conversation with him and try to come to an agreement when you had already told them I agreed

5

to something we didn't even discuss.

Murphy responded:

> I was providing an example. Frankly, if he wants to use fair market value, then you should be able to have additional deductions. I also want to be clear with you, he has every right to demand fair market value. If the market had fallen you would have wanted the reduced fair market value. The delay was partly you getting a job and finding lending. The delay was not entirely him. I am very concerned that you want to place a lower number on him for the value of the property.

> Even at fair market value — once you take out the mortgage, take our 1/2 of what you paid and take out what he owes you, it is not a great deal. Tell him fair market value and then deduct away.

Three days later, Murphy emailed, "Crystal what did the two of you decide? Did you make any progress?" Crystal stated, "No, we haven't reached any agreements yet."

On August 16, 2021, Kulchak asked Murphy whether the Property had been refinanced in Crystal's name. Murphy confirmed that Crystal refinanced the Property, explaining, "Other than recommending a lender many, many months ago, I was not involved in the process. It was my understanding that our clients were going to sit down and work this out between themselves. Are you hearing differently?" Murphy also forwarded Kulchak's email to Crystal, adding:

> I have to admit that I am frustrated that you took it upon yourself to determine what you think your brother was owed, refinanced the house without getting an agreement with your brother and then putting the house in your name. We always talked about you paying fair market value. I am trying to decide whether I should withdraw from this matter.

Crystal, as personal representative, terminated Murphy and Murphy moved to withdraw as the Estate's attorney in September 2021. Murphy's total cost for her legal services was $3,970.89. Attorney Steven Rausch replaced Murphy as counsel for the Estate.

In April 2022, Nicholas, through counsel, filed a separate lawsuit against Crystal (individually and as personal representative), her husband, and her lending company, to set aside the refinance and transfer of the Property. Crystal hired William Smith to defend her in her individual capacity.

On November 21, 2022, Crystal, her husband, and Nicholas signed a settlement agreement. The agreement stated that Nicholas, Crystal, and Tanner "suffered damages in the form of legal cost[s] and attorney fees," which the Estate was required to pay, subject to a reduction "by a proportionate share of the attorney fees and costs incurred in prosecuting the claims against Murphy." Nicholas assigned "all his claims against the Estate, Crystal, and Tanner to the Estate."

Nicholas and Crystal, in her individual capacity, assigned "all their claims against the Estate and its' [sic] agent Murphy to the Estate" and agreed to assist the Estate "in the preparation and prosecution" of a case against Murphy. Crystal paid Nicholas and retained the Property.

## B. Procedural History.

In March 2023, the Estate, through Crystal's personal counsel, Smith, filed a complaint and demand for a jury trial. The Estate alleged that "Murphy as a lawyer licensed to practice law in Idaho" owed duties tied to the Idaho Rules of Professional Conduct, including competence, diligence, communication, confidentiality, candid advice, and truthfulness to third parties, all of which the Estate alleged Murphy breached. The Estate asserted four causes of action: (1) negligence, (2) breach of agreement, (3) violation of the ICPA, and (4) unjust enrichment.

Under the prayer for relief, the Estate requested "compensatory, general, and special damages, all in amounts to be proven at trial," including (1) actual damages; (2) costs and attorney fees pursuant to the sibling's settlement agreement; (3) post-judgment interest; (4) post-judgment fees; (5) the personal representative's past "earnings lost as a result of the breach of duty"; (6) the "reasonable value of necessary services provided by another the breach of duty in doing things for the [personal representative], which, except for the breach of the duty, the [Estate] would ordinarily have performed and the present cash value of such services reasonably certain to be required in the future"; and (7) ICPA remedies.

On February 12, 2024, the Estate disclosed attorney Steve Rausch as its sole expert witness. The disclosure included an exhibit summarizing Rausch's opinions. Murphy subsequently filed several motions and supporting documents, including a motion to strike the Estate's expert witness disclosure, a motion to dismiss, a motion for summary judgment, and the declaration of counsel, Keely E. Duke, in support of the motion for summary judgment and the motion to strike. Murphy's motion to strike argued that Rausch's opinions should be stricken as conclusory and lacking in foundation because he failed to specify the applicable standard of care and only relied on the Idaho Rules of Professional Conduct as the standard of care.

The Estate opposed the motion to strike its expert witness disclosure, contending that Rausch was qualified as an expert by knowledge, skill, experience, training, and education, and that there was "a valid foundational basis for his expert opinions." The Estate conceded that the breach of contract cause of action should be dismissed but opposed Murphy's motion to dismiss and motion for summary judgment on the remaining claims. William Smith filed a declaration of

7

counsel in support of the Estate's opposition that attached exhibits of numerous email correspondences and the Estate's intake form completed by Crystal at the initial consultation with Murphy.

Seven days after the deadline to respond to Murphy's motion to dismiss and motion for summary judgment, the Estate filed a motion for leave to file a late affidavit of its expert witness. The Estate argued that the delay caused no prejudice because Rausch's opinions were already disclosed and remained unchanged. Murphy objected to the motion, arguing that (1) Murphy could not know what Rausch would swear to until after the Estate submitted the affidavit, (2) the late filing left them no opportunity to respond with an expert affidavit, and (3) the Estate failed to provide the affidavit by the required deadline. Murphy also filed a motion to strike portions of Smith's declaration.

After a hearing on the parties' pending motions, the court issued an order (1) denying the Estate's motion for consideration of Rausch's late-filed affidavit submitted in opposition to Murphy's motion for summary judgment, (2) granting Murphy's motion to strike the Estate's expert witness disclosure, (3) granting Murphy's motion to strike portions of Smith's declaration, and (4) granting Murphy's motion for summary judgment. The district court granted Murphy's motion to strike the Estate's expert witness disclosure, including Rausch's affidavit, because the affidavit was untimely filed and, even if it had been timely, the expert's opinions lacked foundation and were speculative. The district court granted Murphy's motion to strike portions of Smith's declaration, noting that the Estate did not oppose or "specifically address the motion . . . ."

The district court granted summary judgment on all four of the Estate's causes of action. On the Estate's negligence claim, the court explained that "to resist a motion for summary judgment in a legal malpractice case," a plaintiff must provide an expert affidavit explaining both how the attorney's conduct fell below the standard of care and how that breach proximately caused damages. It further explained that an expert affidavit is required because those issues are ordinarily outside lay jurors' common knowledge. Since the court did not consider the Estate's only expert affidavit, the court determined that there was no genuine issue of material fact on the elements of breach and causation, and Murphy was entitled to judgment as a matter of law.

Next, the court granted summary judgment on the Estate's claims for breach of contract and unjust enrichment after recognizing that "[l]egal malpractice actions are an amalgam of tort

8

and contract theories." Citing *Bishop v. Owens*, 152 Idaho 616, 620–21, 272 P.3d 1247, 1251–52 (2012), the court explained that

> under the abatement rule, breach of duty is an action in tort, not contract; that is, unless an attorney foolhardily contracts with his client guaranteeing a specific outcome in the litigation or provides for a higher standard of care in the contract, he is held to the standard of care expected of an attorney. And breach of that duty is a tort.

The court determined that breach of contract and unjust enrichment claims were not independent causes of action but instead were based on the same factual allegations as the legal malpractice claim.

Finally, the court granted summary judgment on the Estate's ICPA claim because that claim was "subsumed" by the legal malpractice claim. In addition, the court determined that the Estate did not present evidence of any unfair, deceptive, or unconscionable conduct by Murphy that would satisfy the ICPA's requirements. The court explained that the Estate's causes of action were limited to the quality of legal representation, not to misrepresentation of services. The district court entered judgment in favor of Murphy and dismissed all claims alleged by the Estate with prejudice.

The Estate timely filed a notice of appeal. Shortly after filing its appeal, the Estate also filed a motion for reconsideration with the district court. The court denied the motion, emphasizing that the court had decided all the Estate's claims on a motion for summary judgment under Rule 56 of the Idaho Rules of Civil Procedure, not a motion to dismiss under Rule 12(b)(6). Ultimately, the court declined to consider any of the Estate's untimely affidavits filed in opposition to Murphy's motion for summary judgment and concluded that the Estate did not present new, timely, or admissible evidence, nor did the Estate identify any legal errors to warrant a different outcome on the court's previous decision.

## II.    ISSUES ON APPEAL

1. Did the district court err when it granted summary judgment to Murphy on the Estate's unjust enrichment cause of action?

2. Did the district court err when it granted summary judgment to Murphy on the Estate's ICPA cause of action?

3. Is either party entitled to an award of attorney fees on appeal?

## III. STANDARDS OF REVIEW

This Court reviews a grant of summary judgment de novo, applying the same standard the district court employed in its summary judgment rulings. *Bronco Elite Arts & Athletics, LLC v. 106 Garden City, LLC*, 172 Idaho 506, 513, 534 P.3d 558, 565 (2023) (quoting *Stonebrook Constr., LLC v. Chase Home Fin., LLC*, 152 Idaho 927, 929, 277 P.3d 374, 376 (2012)). "A moving party must support its assertion by citing particular materials in the record or by showing the 'materials cited do not establish the . . . presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact[s].'" *Owen v. Smith*, 168 Idaho 633, 640, 485 P.3d 129, 136 (2021) (alterations in original) (quoting I.R.C.P. 56(c)(1)(B)).

Summary judgment is proper, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." I.R.C.P. 56(a). "Summary judgment is improper 'if reasonable persons could reach differing conclusions or draw conflicting inferences from the evidence presented.'" *Owen*, 168 Idaho at 641, 485 P.3d at 137 (quoting *Trumble v. Farm Bureau Mut. Ins. Co. of Idaho*, 166 Idaho 132, 141, 456 P.3d 201, 210 (2019)).

To oppose summary judgment, the party must support the assertion that a material fact is genuinely disputed by either citing to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials[,]" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute . . . ." I.R.C.P. 56(c)(1). However, courts "may consider other materials in the record." I.R.C.P. 56(c)(3). "All facts and inferences from the record will be viewed in favor of the nonmoving party to determine whether the motion should be granted." *Schriver v. Raptosh*, 174 Idaho 498, 506, 557 P.3d 398, 406 (2024) (quoting *E. Lizard Butte Water Corp. v. Howell*, 122 Idaho 679, 681, 837 P.2d 805, 807 (1992)).

## IV. ANALYSIS

The Estate does not appeal the district court's decision to grant summary judgment on its claims for negligence or breach of agreement. Nor does the Estate challenge the court's decisions to grant Murphy's motions to strike or to deny the Estate's motion to reconsider. We express no opinion regarding those decisions. The Estate appeals the district court's order granting summary judgment and dismissing its unjust enrichment and ICPA causes of action. Each cause of action is addressed in turn.

**A. The district court properly granted summary judgment on the Estate's unjust enrichment cause of action.**

The district court granted summary judgment after concluding that the unjust enrichment claim was "not an independent cause of action distinguishable from [the Estate's] legal malpractice claim." On appeal, the Estate contends that unjust enrichment is an independent equitable theory of recovery distinct from its legal malpractice cause of action. Murphy responds that the claim does not constitute an independent cause of action because it is "based on the same allegations of fact related to . . . Murphy's alleged negligent representation of the Estate." Before turning to the merits of the Estate's appeal, we first address the threshold preservation issue raised by Murphy.

1. The Estate's argument that its unjust enrichment claim is an equitable claim for fee disgorgement, distinct from its legal malpractice claim, was preserved for appeal.

Murphy argues that the Estate waived appellate review of its unjust enrichment claim because the Estate failed to meaningfully oppose or identify disputed facts necessary to overcome summary judgment on the claim before the district court.

This Court has repeatedly held that "a party preserves an issue for appeal by [either] properly presenting the issue with argument and authority to the trial court below," or by obtaining an adverse ruling from the trial court. *See, e.g.*, *State v. Miramontes*, 170 Idaho 920, 924–25, 517 P.3d 849, 853–54 (2022). "Both are not required." *Id.*

Murphy emphasizes the district court's statement that the Estate "offers no argument or legal authority disputing or opposing [Murphy's] argument that the unjust enrichment claim has no independent basis separate from legal malpractice." The record belies that statement. Murphy argued on summary judgment that unjust enrichment "is not an independent cause of action from the Estate's legal malpractice claim" because the former claim relied on the same facts as the latter claim. The Estate explained in its response brief that it had "sufficiently stated claims" including unjust enrichment and that the "claims are not subsumed by a legal malpractice theory, . . . but rather stand as independent causes of action arising from distinct wrongful acts and omissions."

During the hearing on the motion, the district court asked the Estate to explain why it was conceding breach of contract but not unjust enrichment. The court asked if the unjust enrichment theory was "really just pleading in the alternative to [a] breach of a contract claim? And if so, if the breach of contract claim goes away, then what would be the legal justification for keep doing [sic] the unjust enrichment claim"? In response, the Estate explained that unjust enrichment is "basically" a breach of fiduciary duty. The Estate described the claim as "an equitable theory"

11

requiring disgorgement of fees, which are an alternative to a legal malpractice recovery under *Parkinson v. Bevis*, 165 Idaho 599, 448 P.3d 1027 (2019). The court inquired further, "Oh, so the unjust enrichment was plead[ed] as an alternative to the malpractice issue and not the breach of contract issue?" The Estate clarified that unjust enrichment "was [pleaded] as the alternative to all four just because they all -- they all seemed a little bit duplicative, but it's a weird little animal the way she suffered the damage [at] issue there." This exchange shows that the district court recognized the Estate's position that the unjust enrichment cause of action was an independent claim for fee disgorgement tied to *Parkinson*. Moreover, although the district court recognized the position, it was unpersuaded by the Estate's argument, concluding that the Estate's "breach of contract and unjust enrichment claims" did not provide "an independent cause of action under the facts of [the] case." Therefore, we conclude that the Estate preserved this issue for appeal.

2. Unjust enrichment, as alleged by the Estate in this case, cannot proceed as an independent cause of action.

The Estate alleged unjust enrichment as an alternative cause of action to legal malpractice. The question is whether the unjust enrichment theory states a claim for relief independent from the malpractice theory, or whether it simply relabels legal malpractice.

Unjust enrichment is "a non-contractual obligation that is . . . treated procedurally as if it were a contract[.]" *Hull v. Giesler*, 156 Idaho 765, 777, 331 P.3d 507, 519 (2014) (citation omitted). It is not a contract "but an obligation imposed by law" to bring "about justice and equity without reference to the intent of the agreement of the parties, and, in some cases, in spite of an agreement between the parties." *Pickering v. Sanchez*, 173 Idaho 478, 489, 544 P.3d 135, 146 (2024) (citation omitted). To prevail, the plaintiff must establish three elements: (1) a benefit was conferred on the defendant by the plaintiff; (2) the defendant appreciated the benefit; and (3) it would be inequitable for the defendant to accept the benefit without payment of the value of that benefit. *Id.* Critically, unjust enrichment is an equitable remedy that is "subordinate to contractual remedies." *Gilbert v. Progressive Nw. Ins. Co.*, ___ Idaho ___, ___, 577 P.3d 519, 534 (2025) (quoting *Asher v. McMillan*, 169 Idaho 701, 707, 503 P.3d 172, 178 (2021)). When an "express agreement is enforceable," courts will not apply "the equitable doctrine of unjust enrichment in contravention of the express contract." *Id.* (quoting *Bates v. Seldin*, 146 Idaho 772, 776–77, 203 P.3d 702, 706–07 (2009)).

The parties do not dispute the existence of an attorney-client relationship between the Estate and Murphy, or that Murphy received approximately $3,970.89 for legal services that she

12

provided to the Estate. The Estate's complaint alleged that Murphy's retention of those fees is unjust in light of her misconduct during the representation. The alleged misconduct falls into four categories: (1) disclosure of a confidential email between Crystal and Murphy to Nicholas during the October 1, 2020, meeting; (2) consistent advice to refinance the Property rather than sell it, ultimately resulting in the Property's transfer to Crystal and her husband; (3) communications with Nicholas' attorney that included inaccurate numbers for the Estate, provided without the personal representative's knowledge or input; and (4) withdrawal from the representation after her conduct created unnecessary contention, followed by her failure to produce the Estate's complete legal file.

These allegations are not unique to the unjust enrichment claim; rather, they are the same facts the Estate emphasized in its opposition brief before the district court to demonstrate Murphy's breach of the duty of care under the negligence (malpractice) cause of action.

We have consistently held that, while legal malpractice actions combine elements of both tort and contract theories, they generally sound in tort, not in contract. *See, e.g.*, *Bishop v. Owens*, 152 Idaho 616, 620, 272 P.3d 1247, 1251 (2012). In *Bishop*, this Court explained that, while malpractice actions may be seen as an "amalgam of tort and contract theories, when the allegation is that an attorney failed to meet the standard of care expected of an attorney arising from the attorney-client relationship, "[a] person cannot change a tort action into a contract action simply by labeling it as such." *Id.* at 620–21, 272 P.3d at 1251–52 (citations omitted). Although "[t]he scope of an attorney's contractual duty to a client is defined by the purposes for which the attorney is retained," the duties owed are not created by the fee agreement; instead, an attorney's duties are "defined by the Idaho Rules of Professional Conduct." *Id.* at 620, 272 P.3d at 1251 (citations omitted).

Here, Murphy's duty to the Estate arose from the attorney-client relationship. *See id.* at 621, 272 P.3d at 1552. The misconduct alleged by the Estate, if true, would constitute a breach of Murphy's professional duty of care, defined by the relevant Rules of Professional Conduct. *See, e.g.*, Idaho R. of Prof'l Conduct 1.1, 1.3, 1.6, 4.1 (2004). They are malpractice allegations.

The Estate cites *Parkinson* to support its assertion that unjust enrichment is an independent equitable theory of recovery available even after dismissal of a legal malpractice claim. The Estate's reliance on *Parkinson* is unavailing because it conflates unjust enrichment with breach of fiduciary duty based on each theory's equitable character. In *Parkinson*, this Court addressed whether a client could pursue a breach of fiduciary duty claim seeking fee disgorgement as a

13

remedy distinct from a legal malpractice claim. 165 Idaho at 604, 448 P.3d at 1032. We adopted section 37, comment d, of the Restatement (Third) of the Law Governing Lawyers, holding that fee forfeiture is an available sanction when an attorney commits a clear and serious breach of fiduciary duty to a client. *Id.* at 607, 448 P.3d at 1035. The relevant factors for determining whether fee forfeiture is appropriate include the extent of the misconduct, whether the breach involved knowing violation or conscious disloyalty to a client, whether forfeiture is proportionate to the seriousness of the offense, and the adequacy of other remedies. *Id*. (citing Restatement (Third) of the Law Governing Lawyers § 37 cmt. d (2000)).

Unjust enrichment and breach of fiduciary duty are distinct causes of action with separate elements. As previously stated, unjust enrichment requires proof that a benefit was conferred, appreciated, and inequitably retained. *Pickering*, 173 Idaho at 489, 544 P.3d at 146. In contrast, breach of fiduciary duty requires proof that the defendant owed a fiduciary duty to the plaintiff and that this duty was breached in a clear and serious manner. *Parkinson*, 165 Idaho at 609, 448 P.3d at 1037. The Estate did not allege a cause of action against Murphy for breach of fiduciary duty. It pleaded unjust enrichment. Our reasoning in *Parkinson*, that breach of fiduciary duty may proceed independently of malpractice, does not extend to unjust enrichment claims premised on the same allegations of professional negligence.

Moreover, the holding in *Parkinson* is narrow. We explained that

> [t]o the extent that legal malpractice plaintiffs seek both damages and fee disgorgement, the principles articulated in this decision would apply to the equitable portion of the claim. But, if the breach of fiduciary duty claim includes a claim for damages, that claim is appropriately subsumed by the legal malpractice claim.

*Id.* at 608, 448 P.3d at 1036. The result in *Parkinson* "offer[s] relief to a client *only* in those cases in which the client seeks fee disgorgement as a solitary remedy." *Id.* Here, the Estate did not seek fee disgorgement as a solitary remedy. Rather, it sought forfeiture of the $3,970.89 in attorney fees paid to Murphy under the unjust enrichment claim while simultaneously claiming $37,777.63 in damages under the negligence (legal malpractice) claim.

The Estate next contends that Rule 8 of the Idaho Rules of Civil Procedure permits pleading unjust enrichment in the alternative, citing *Thomas v. Thomas*, 150 Idaho 636, 644, 249 P.3d 829, 837 (2011). In *Thomas*, a son filed breach of oral contract and unjust enrichment claims against his parents after his father orally promised to transfer a family car dealership to him in exchange for working at reduced pay. *Id.* at 638, 249 P.3d at 831. The son worked for below-market

compensation, but his parents sold the dealership to a third party. *Id.* at 639, 249 P.3d at 832. On a motion for summary judgment, the district court dismissed the unjust enrichment claim. *Id.* at 640, 249 P.3d at 833. The district court explained that express employment contracts governed the parties' relationship and compensation. *Id.* On a second motion for summary judgment, the court dismissed the oral contract claim, holding that a material price term was never agreed upon and that the contract was unenforceable. *Id.* at 641, 249 P.3d at 834.

The son appealed, challenging the district court's unjust enrichment decision. *Id.* This Court noted a procedural concern with the trial court's premature dismissal of the unjust enrichment claim before determining whether the asserted express agreements were enforceable, since unjust enrichment may be available when no enforceable contract governs. *See id.* at 643–44, 249 P.3d at 836–37. The Court further explained that had both parties "unequivocally admitted the existence and enforceability of all provisions of the [contract], the Court would have to dismiss [the] unjust enrichment claim." *Id.* (first alteration in original) (quoting *Brown & Brown, Inc. v. Cola*, 745 F. Supp. 2d 588, 625 (E.D. Pa. 2010)). Since the enforceability of the oral contract remained in dispute, the unjust enrichment claim persisted as an alternative theory. *See id.* Nevertheless, this Court affirmed the judgment in favor of the parents after determining that subsequently executed written contracts superseded the oral contract and were enforceable. *Id.* at 644–45, 249 P.3d at 837–38.

*Thomas* is inapposite. There, the dispute concerned the enforceability of an express contract, and unjust enrichment served as an alternative if the contract was found unenforceable. *Id.* at 644, 249 P.3d at 837. In this case, the Estate's unjust enrichment claim is not an alternative to a contract claim. As explained above, the Estate's unjust enrichment claim is an alternative to a tort claim. *See Bishop*, 152 Idaho at 620, 272 P.3d at 1251. The attorney-client relationship between the Estate and Murphy is undisputed. While the parties disagree about whether a written agreement existed, that dispute is immaterial because the duty Murphy owed the Estate arose from the professional relationship, and any alleged breach of that duty is a tort, not a breach of contract. *See id.* The Estate "cannot change a tort action into a contract action simply by labeling it as such." *Id.* at 621, 272 P.3d at 1252.

The Estate has not established any element of unjust enrichment independent of its malpractice theory; rather, it has recast the same claim under a quasi-contractual label. We affirm the district court's summary judgment in favor of Murphy on this cause of action.

15

**B. The district court properly granted summary judgment on the Estate's ICPA cause of action.**

On appeal, the Estate asserts that the district court erred in granting summary judgment on its claim that Murphy violated the ICPA, as set forth in Idaho Code sections 48-601 through 48-619. The district court granted summary judgment in Murphy's favor on two independent grounds. First, it concluded that the ICPA claim arose from the same attorney-client relationship and allegations of negligent representation and was, therefore, subsumed by the malpractice claim. Second, the court determined that the Estate failed to present evidence of any unfair, deceptive, or unconscionable conduct by Murphy sufficient to satisfy the ICPA's requirements.

The Estate contends that the district court applied the incorrect legal standard, that the ICPA applies to attorneys, that it identified conduct constituting violations of Idaho Code section 48-603(13) and (17), and that the ICPA claim is not subsumed by the legal malpractice claim.

1. Governing principles of the ICPA.

The ICPA declares unlawful certain "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" I.C. § 48-603. The purpose of the ICPA is "to protect both consumers and businesses against unfair methods of competition and unfair or deceptive acts and practices in the conduct of trade or commerce, and to provide efficient and economical procedures to secure such protection." I.C. § 48-601. "Trade" and "commerce" are defined as "the advertising, offering for sale, selling, leasing, renting, collecting debts arising out of the sale or lease of goods or services or distributing goods or services, either to or from locations within the state of Idaho, or directly or indirectly affecting the people of this state." I.C. § 48-602(2). "Services" are defined as "work, labor or any other act or practice provided or performed by a seller to or on behalf of a consumer." I.C. § 48-602(7).

Section 48-608(1) provides the cause of action and remedies for a consumer. To establish a claim under the ICPA, a consumer must prove three elements: (1) the consumer purchased goods or services from a seller; (2) the seller engaged in unfair or deceptive acts or practices declared unlawful under the ICPA; and (3) the unfair acts or practices caused the consumer to suffer an ascertainable loss of money or property. I.C. § 48-608(1); *Litster Frost Inj. Laws., PLLC v. Idaho Inj. L. Grp., PLLC*, 171 Idaho 1, 11, 518 P.3d 1, 11 (2022). "If a consumer proves all three elements, he or she may elect remedies." *Id.* (citing I.C. § 48-608(1)). "[A]n assortment of remedies is available," including "rescission, damages, restitution, injunctive relief, punitive

16

damages, and 'any other appropriate relief which the court in its discretion may deem just and necessary.'" *Id.* at 15, 518 P.3d at 15 (quoting I.C. § 48-608(1)).

Proof of intent to deceive is not required; rather, "the offending party must be a person who knows, or in the exercise of due care should know, that he has in the past, or is [currently,] committing an act or practice declared unlawful" under the ICPA. *Tricore Invs., LLC v. Est. of Warren ex rel. Warren*, 168 Idaho 596, 618, 485 P.3d 92, 114 (2021) (citation modified). The ICPA also prohibits unconscionable conduct in trade or commerce, "whether it occurs before, during, or after the conduct of the trade or commerce." I.C. § 48-603C(1).

### 2. The Estate failed to produce evidence of an ICPA violation.

The Estate maintains that *Litster Frost* establishes that attorneys and law firms are subject to ICPA liability, and that the district court should have first analyzed whether Murphy provided "services." The Estate further asserts that there is no statutory exception for attorneys under the ICPA, noting that Idaho Code section 48-605 provides exceptions for broadcasters, publishers, and public utilities, and that the legislature could have excluded attorneys if it intended to do so.

Murphy acknowledges that attorneys are not exempt from ICPA claims. The holding in *Litster Frost* confirms that the ICPA can apply to attorneys in appropriate circumstances, such as when a law firm engages in deceptive practices regarding the terms of a fee agreement. 171 Idaho at 11–13, 518 P.3d at 11–13.

The Estate's complaint alleged violations of Idaho Code section 48-603(5), (9), (13), and (17), as well as Idaho Code section 48-603C. On appeal, however, the Estate narrows its argument to section 48-603(13) and (17). We address those provisions in turn.

### a. The Estate did not create a genuine issue of material fact under Idaho Code section 48-603(13).

Idaho Code section 48-603(13) specifically prohibits a seller from "[f]ailing to deliver to the consumer at the time of the consumer's signature a legible copy of the contract or of any other document that the seller or lender has required or requested the buyer to sign, and that he has signed, during or after the contract negotiation[.]" I.C. § 48-603(13). The Estate contends that Murphy violated this provision by failing to provide the personal representative with a copy of the contract she signed upon establishing the attorney-client relationship, and that the signed contract did not surface until discovery in this case, more than four years later. Murphy responds that the Estate's personal representative never signed a contract. The district court found that the Estate did not present sufficient facts to overcome summary judgment on this theory.

17

We agree with the district court. At summary judgment, the Estate bore the burden of presenting sufficient evidence to demonstrate a genuine issue of material fact. *Kiebert v. Goss*, 144 Idaho 225, 228, 159 P.3d 862, 865 (2007). The Estate's verified complaint alleged that "[u]pon information and belief," the agreement "was signed" and that Murphy "failed or refused to provide a copy . . . ." However, in opposition to summary judgment the Estate did not submit evidence establishing that a signed contract existed or separately develop the significance of the alleged omission under Idaho Code section 48-603(13).

The Estate did not develop its argument in detail until its reply brief on appeal. Even then, the document it identified was a one-page intake form requesting general client information. At the top, the form stated, "CONSULTATION FEE *due at time of service* . . . $250 per Hour." The remainder of the form collected the personal representative's legal name, address, phone number, email, and employer information; two lines for initials were left blank. The intake form is not a signed contract. In addition, the Estate did not show how the alleged failure to provide a copy of the intake form caused an "ascertainable loss of money or property" as Idaho Code section 48-608(1) requires. *See Litster Frost*, 171 Idaho at 13–14, 518 P.3d at 13–14 (explaining the client was deprived of money "she would have otherwise been entitled to"). The Estate did not establish a genuine issue of material fact that Idaho Code section 48-603(13) was violated.

b. The Estate did not create a genuine issue of material fact under Idaho Code section 48-603(17).

Idaho Code section 48-603(17) declares it unlawful to engage "in any act or practice that is otherwise misleading, false, or deceptive to the consumer[.]" I.C. § 48-603(17). To sustain a claim under this provision, the consumer must demonstrate that the defendant knew, or in the exercise of due care should have known, that the statements or conduct at issue were misleading, false, or deceptive. *Tricore Invs., LLC*, 168 Idaho at 618, 485 P.3d at 114 (citing I.C. § 48-603(17)).

The Estate identifies five categories of alleged misleading, false, or deceptive conduct: (1) Murphy gave consistent advice regarding refinancing the Property and later changed that advice; (2) Murphy misrepresented her role in the refinancing process to opposing counsel; (3) Murphy shared the personal representative's confidential email with Nicholas during the October 2020 meeting; (4) Murphy provided inaccurate information to opposing counsel without the personal representative's knowledge; and (5) Murphy withdrew from representation when the Estate was exposed to litigation.

Those allegations do not establish an ICPA claim. The ICPA targets consumer-facing deception in trade or commerce, such as misrepresenting the characteristics of goods or services, advertising services with an intent not to sell them as advertised, or otherwise misleading consumers about the transaction. *See* I.C. § 48-603(1)–(18). For example, in *Lister Frost*, a law firm violated the ICPA by guaranteeing that it "would not charge [the client] anything" if she terminated the firm before receiving a settlement offer, in direct contradiction of the language in the written fee agreement stating that the client will be charged if the client fires the firm regardless of whether the client receives a settlement offer. 171 Idaho at 13, 518 P.3d at 13. In *Duspiva v. Fillmore*, we concluded that a well driller violated the ICPA by misleading consumers regarding the regulatory and practical consequences of a deeper well. 154 Idaho 27, 33–34, 293 P.3d 651, 657–58 (2013). In contrast, in *Pickering*, a landlord's statements regarding a lease agreement did not violate the ICPA because the statements were subject to conflicting inferences rather than being deceptive. 173 Idaho at 486, 544 P.3d at 143.

The conduct alleged by the Estate concerns Murphy's performance as counsel within an attorney-client relationship, not deceptive representations. The allegation that Murphy changed her advice about refinancing the Property challenges the quality of legal services. The allegation that she shared a confidential email concerns the handling of privileged communications. The allegation regarding statements to opposing counsel concern litigation-related communication. Finally, the allegation that she withdrew from representation concerns the termination of the attorney-client relationship. Those acts do not amount to misleading, false, or deceptive consumer practices within the meaning of Idaho Code section 48-603(17).

In summary, the Estate failed to produce evidence raising a genuine issue of material fact that Murphy engaged in conduct prohibited by the ICPA. Accordingly, the district court properly granted summary judgment in Murphy's favor. We affirm the district court's decision granting summary judgment in Murphy's favor on the Estate's ICPA cause of action and we need not address whether the ICPA claim was subsumed by the malpractice claim.

## C.  Neither party is entitled to attorney fees on appeal.

Murphy requests attorney fees on appeal under Rule 41 of the Idaho Appellate Rules and Idaho Code section 12-121. Murphy argues that this appeal was pursued frivolously, unreasonably, and without foundation because the Estate did not identify facts in the record to support its unjust enrichment or violation of the ICPA claims.

Attorney fees on appeal under Idaho Code section 12-121 are not awarded to a prevailing party as a matter of right but, rather, are subject to this court's discretion. *See Snap! Mobile, Inc. v. Vertical Raise, LLC*, 173 Idaho 499, 528, 544 P.3d 714, 743 (2024). "In any civil action, the judge may award reasonable attorney's fees to the prevailing party or parties when the judge finds that the case was brought, pursued or defended frivolously, unreasonably or without foundation." I.C. § 12-121. On appeal, "[a]n award of attorney fees is appropriate if the law is well-settled and the appellants have made no substantial showing that the district court misapplied the law." *Ramlow v. Mitchell*, ___ Idaho ___, ___, 571 P.3d 437, 443–44 (2025) (citation omitted).

Because we affirm the district court's decision, Murphy is the prevailing party. In the litigation between the Estate and Murphy, the Estate raised valid and serious concerns about Murphy's advice, communications, and conduct while representing the Estate. Ultimately, however, the manner in which the Estate prosecuted this appeal, including the issues it raised and the arguments it advanced, was unavailing. Although a close question, we decline to conclude that the appeal was pursued frivolously, unreasonably, or without foundation.

As the prevailing party, Murphy is entitled to recover costs on appeal under Idaho Appellate Rule 40(a).

## V. CONCLUSION

We affirm the district court's judgment in Murphy's favor. Costs on appeal are awarded to Murphy.

Chief Justice BEVAN and Justices BRODY, MOELLER and BURDICK, J. Pro Tem, CONCUR.

20